UNITED STATES of America, Plaintiff,

STATE OF NEW YORK and Barbara De-
Buono, M.D., as Commissioner of the
New York Department of Health, Plain-
tiffs–Intervenors,

v.

CITY OF NEW YORK and New York
City Department of Environmental
Protection, Defendants.

No. 97 CV 2154(NG)(SMG).

United States District Court,
E.D. New York.

Nov. 24, 1998.

Deborah B. Zwany, U.S. Attorney's Office
Civil Div., Brooklyn, NY, for U.S.

Gordon J. Johnson, Atty. General's Office,
New York City, Norman Spiegel, Atty. Gen.
for State of New York, Environmental Pro-
tection Bureau, New York City, for State of
New York, Barbara DeBuono, M.D.

Paul A. Crotty, Inga Van Eysden, Corpo-
ration Counsel of City of New York, New
York City, for City of New York, NYC Dept.
of Environmental Protection, defendants.

Inga Van Eysden, NYC law Dept., New
York City, for City of New York, NYC Dept.
of Environmental Protection, HDFC Coali-
tion, Helen C. Reed, Steven B. Kaplan, Aar-
on Bock, intervenor–defendants.

## MEMORANDUM AND ORDER

GERSHON, District Judge.

The United States, acting on behalf of the
Environmental Protection Agency ("EPA"),
the State of New York and the City of New
York seek approval of a Consent Decree
which resolves the claims brought by the
United States and the State against the City
to require the City to provide filtration and
disinfection treatment for its Croton Water
Supply System. The claims were brought
under the Safe Drinking Water Act
("SDWA"), 42 U.S.C. § 300g–3(b), to enforce

the Surface Water Treatment Rule ("SWTR"), 40 C.F.R. § 141.70 *et seq.;* and to enforce the parallel provisions of the State Sanitary Code ("SSC"), 10 N.Y. Comp.Codes R. & Regs. tit. 10, § 5–1.30(b). In addition to the papers filed by the parties, public comments have been filed with the court pursuant to a Department of Justice Regulation, 28 C.F.R. § 50.7, which requires the Department, prior to the entry of a consent judgment, to receive, consider and file with the court public comments relating to the proposed judgment.

### The Croton Water Supply System

The City owns and operates a public water system serving approximately nine million customers through approximately 700,000 commercial and residential service connections. The system relies primarily on surface water sources from the Catskill, Delaware and Croton Watersheds. As defined in the Consent Decree, the "Croton Water Supply System" shall mean:

> the Amawalk, Bog Brook, Cross River, Croton Falls, Diverting, East Branch, Middle Branch, Muscoot, New Croton, and Titicus Reservoirs; Kirk Lake, Lake Gleneida and Lake Gilead ("controlled lakes"); the tunnels, dams, streams, and aqueducts which are part of and connect the above-listed reservoirs and controlled lakes; the Jerome Park Reservoir; the New Croton Aqueduct; and any other facilities and structures used in delivering water by means of the New Croton Aqueduct to the New York City drinking water distribution system.

The Croton Watershed is defined as "the drainage basins of the reservoirs and controlled lakes of the Croton Water Supply System." According to New York City Department of Environmental Protection ("NYCDEP") Reports, submitted to the court by the United States, the Croton Watershed has an area of 375 square miles and lies almost entirely within New York State, primarily in Westchester, Putnam and Dutchess Counties, with a small portion in Connecticut. The environs of the Croton Watershed are populated by approximately 168,000 people and contain over sixty sewage treatments plants and an estimated 80,000

septic tanks. In recent years the Croton Watershed has normally accounted for about ten percent of the City's water consumption, but provides up to twenty-five percent during drought conditions. In contrast, the Catskill and Delaware Watersheds, which provide the bulk of the City's water, cover areas vastly larger than the Croton Watershed, and their surroundings are far less inhabited and developed. To date, the City of New York has been permitted to avoid filtration in the Catskill and Delaware watersheds.

### Statutory and Regulatory Requirements

The SDWA was enacted in 1974 to "assure that all citizens served by public water systems would be provided high quality water supplies." S.Rep. No. 99–56 at 1, *reprinted in* 1986 U.S.C.C.A.N. 1566, 1566. The SDWA authorizes the EPA to promulgate national drinking water regulations that require the use of a "treatment technique" in lieu of establishing a maximum contaminant level where it is not economically or technologically feasible to ascertain the level of a contaminant in drinking water. 42 U.S.C. § 300g–1(b)(7)(A). Congress specifically directed the EPA in the 1986 Amendments to the SDWA to promulgate a national primary drinking water regulation ("NPDWR") specifying criteria under which *filtration* and *disinfection* are required as treatment techniques for public water systems using surface water sources. 42 U.S.C. §§ 300g–1(b)(7)(C)(i), 300g–1(b)(8) (emphasis added); *see* 54 Fed.Reg. 27486, 27487. As set forth in the legislative history of the 1986 SDWA Amendments: "It is clear that the national goal of safe drinking water has not been fulfilled and the aims of the Safe Drinking Water Act have never been more essential." S.Rep. No. 99–56 at 2, *reprinted in* 1986 U.S.C.C.A.N. 1566, 1567.

To comply with this 1986 mandate, the EPA promulgated the Surface Water Treatment Rule as a national primary drinking water regulation, after public comments and public hearings. 54 Fed.Reg. 27486. The SWTR's purpose is to provide protection "against the potential adverse health effects of exposure to Giardia lamblia, viruses, Legionella, and heterotrophic bacteria, as well as many other pathogenic organisms" found

in surface water. 52 Fed.Reg. 42178; *see also* 54 Fed.Reg. 27486, 27488. The SWTR requires that public water systems that use surface waters as a drinking water source provide filtration where (1) the agency with primacy enforcement responsibility determines that filtration is required or (2) where the public water system has failed to demonstrate compliance with the filtration avoidance criteria set forth in 40 C.F.R. § 141.71, or both. 40 C.F.R. §§ 141.70 *et seq.* In 1992, the State amended the SSC to comply with federal requirements by providing that the "minimum treatment" for surface water sources shall be filtration and disinfection techniques unless filtration avoidance criteria are met. 10 N.Y. Comp.Codes R. & Regs. tit. 10, § 5–1.30(b). Where filtration is required, the SWTR directs the public water system to install filtration for the surface water source(s) and meet the criteria for filtered systems specified in 40 C.F.R. §§ 141.72(b) and 141.73 by June 29, 1993. 40 C.F.R. § 141.71; *see also* 10 N.Y. Comp. Codes R. & Regs. tit. 10, § 5–1.30(c) (requiring the same under the SSC).

**Filtration of the Croton Watershed**

In 1991, a City report entitled "New York City's Long–Range Water Quality, Watershed Protection and Filtration Avoidance Program" concluded that the safety of water from the Croton Watershed should be ensured through filtration treatment. In 1992, the City entered into a stipulation with the New York State Department of Health ("NYSDOH") pursuant to which the City acknowledged that it was required by federal and state law to build a filtration plant for the Croton Watershed. The stipulation further provided that the City would have the final design of the plant completed by July 1995 and that construction of the plant would be completed by July 1999.

On January 13, 1993, the EPA issued a determination that the SWTR required the City to filter and disinfect the water from the Croton Watershed. It noted the 1992 stipulation between the State and the City requiring the City to provide filtration and also noted that the City had not demonstrated compliance with the filtration avoidance criteria. Although the City was informed by the EPA of its right to challenge the determination through administrative procedures, such a challenge was not undertaken. The City has not complied with the 1992 stipulation or with the 1993 determination, and it has not constructed the required filtration and disinfection plant.

**The Proposed Consent Decree**

The express purpose of the Consent Decree is to bring the City into full compliance with the SDWA, the SWTR and the SSC and all provisions of applicable federal and state laws and regulations governing public water systems, with respect to water supplied by the City to the New York City drinking water distribution system from the Croton Water Supply System. The Consent Decree, some sixty-five pages long plus attachments, provides permanent injunctive relief requiring the City to comply with the SDWA, the SWTR and the SSC by finishing the planning, designing, construction and operation of a Water Treatment Plant, at a site to be selected by the City after completing an environmental review. The Consent Decree sets forth detailed "milestones" which the City must meet in fulfilling this obligation. Very briefly, these include that it recommend a preferred site by December 1, 1998, submit a final environmental impact statement by July 31, 1999, submit a preliminary design by June 1, 2000 and a final design by March 1, 2001. Construction necessary for start-up operations must be completed by September 1, 2006, and operation in compliance with applicable laws must commence by March 1, 2007. The City has agreed to commence performance of the milestones in the Consent Decree even before its approval by the court.

If the City fails to meet the milestones or other requirements of the Consent Decree, it must pay stipulated penalties which include escalating per day penalties for failure to comply with the planning and construction milestones. There are also reporting requirements, and a Force Majeure section which deals with delays beyond the City's control. The parties are obligated to attempt to resolve disputes arising under the Consent Decree, and unresolved disputes may be presented to the court, which will retain jurisdiction.

Penalties are imposed against the City for its past failure to have complied with the filtration requirement. One million dollars is imposed as a civil penalty to be paid to the United States. In addition, the City agrees to implement four Supplemental Environmental Projects ("SEP"s) for a total cost of five million dollars. The SEPs are projects, to which the City is not otherwise obligated, for protection of the Croton Watershed, including the purchase of fee title or conservation easements on real property and the providing of sewers in areas in the Village of Brewster with failing septic tanks. (In response to a public comment from the Village of Brewster, the scope of sewering has by agreement of all parties been extended in this SEP.)

In addition, the Consent Decree provides for interim injunctive relief, including inspection and monitoring, to assure the safety of the water supply during the term of the Consent Decree. It also requires the City to comply with certain contractual commitments it made in a January 21, 1997 Memorandum of Agreement entered into by the EPA, the State and the City as well as local communities within the Croton Watershed with regard to protection of the Watershed, including providing $2.8 million for planning and sewerage initiatives in Westchester and Putnam Counties and $10 million to acquire fee title or conservation easements.

**Public Comments**

As required by 28 C.F.R. § 50.7, a 30-day period was afforded in which persons not named as parties might comment on the Consent Decree. Under § 50.7, the Department of Justice is required to consider the comments received and to file them with the court; the Department has the right to withdraw or withhold its consent if the comments indicate that the proposed decree is inappropriate, improper or inadequate. Over forty individuals and entities, public and private, have filed comments. Counsel for the United States has responded to each of the comments, and the court has accepted for filing additional comments, submitted after the comment period, which reply to those responses.

The principal concerns expressed by those comments which challenge the Consent Decree fall into one of two categories: (1) filtration is unnecessary or even dangerous; and (2) accepting the need for filtration, there are flaws in the process for siting the filtration plant.

In evaluating the comments, it must be remembered that the Consent Decree resolves a particular piece of litigation, which has as its purpose the enforcement of a long-established legal requirement that the waters of the Croton Watershed be filtered in order to provide safe drinking water, out of the tap, to all members of the public who rely on City water. While the opportunity for public comment does not transform this judicial proceeding into an administrative or legislative one, the issues involved are of deep public concern, and the court's obligation under the SDWA is to assure that the Consent Decree furthers the statute's objectives. The public comments, and the responses to them, have been helpful in evaluating whether to approve the Consent Decree and understanding the role that the Consent Decree is expected to play in the assurance of public drinking water safety. It is with these thoughts in mind that I have carefully considered all of the comments to determine whether they suggest any basis for rejecting the Consent Decree.

I address first those comments which challenge the wisdom or necessity of filtration. Some argue that the purity of the water supply should be assured, not through filtration, but, for example, through the use of other technologies or through greater protection of the Watershed. Concern is also expressed for the unhealthy conditions that will be created during the period of construction. Some argue that the New York State Environmental Quality Review Act ("SEQRA"), N.Y. Envtl. Conserv. Law §§ 8-0101 *et seq.*, will be violated if a non-filtration option is not considered. There are also claims that the underlying determinations requiring filtration were flawed, and there are requests that the court open the entire filtration issue for a new determination, either by the court or an administrative body.

As was stated in the denial of the motions to intervene in this action, the merits and timeliness of claims regarding alleged flaws in the course of the prior administrative proceedings leading to EPA's 1993 filtration determination are simply not at issue in this litigation. *United States v. City of New York,* 179 F.R.D. 373, 379–80 (E.D.N.Y.1998). The power afforded the court under 42 U.S.C. § 300g–3(b) is the power to fashion relief specifically for the purpose of ensuring compliance with that determination, and not to evaluate Congress's conclusions regarding filtration or revisit the administrative Rule and determination issued pursuant to Congressional mandate. Put another way, it is not for the court, under the guise of reviewing a Consent Decree aimed at ensuring compliance with statutory and administrative filtration requirements, to adjudicate itself the need for filtration or require the administrative agency to reopen its proceedings. Whatever procedures might have been available for seeking administrative consideration of the concerns here expressed cannot be evaded by raising the issues in this enforcement action.

Some suggest that a "dual track" be pursued, to allow the City to offer non-filtration alternatives. The City has represented that it continues to study non-filtration alternatives and that it may seek modification of the Consent Decree. Because of this, it is argued that there is no "meeting of the minds" between the United States and the City of New York. This is incorrect. Based upon the responses of both the City and the United States to this argument, there is in fact fundamental agreement between them that the unequivocal obligation of the City to construct a filtration plant is the central term of the Consent Decree and that only a modification of the Consent Decree obtained pursuant to Rule 60(b) of the Federal Rules of Civil Procedure could alter that obligation. Finally, the suggestion that the milestones set forth in the Consent Decree be delayed to give the City more time to present alternatives to filtration is rejected. The City itself, which has been out of compliance with the filtration requirement for many years, and whose own technical studies have acknowledged the absence of currently available non-filtration alternatives, has agreed to the milestones.

There are also challenges to the definition of "water treatment plant" as "all filtration disinfection and other facilities necessary for the City to be capable of providing filtered and disinfected water for its Croton Water Supply System." The objection is that "other facilities" may be read to include facilities which are not required by federal and state law. As the United States notes in response, depending on the site selected, in order to accomplish the goal of assuring that filtered and disinfected water is provided to the distribution system, it may be necessary to construct a pump station or other facility as well as the filtration plant itself. It is therefore not a basis for rejection of the Consent Decree that the City of New York has agreed to build such facilities.

Turning to the site selection comments, members of the community surrounding the Jerome Park Reservoir in the Bronx, and community organizations, some of whom recognize the need for filtration, oppose the plant's construction at that location. Some recommend an alternative site, Shandler Field in Van Cortlandt Park, as less intrusive on a high-density, residential community containing numerous educational institutions. Some argue that the Jerome Park Reservoir site would burden a minority neighborhood with an unfair share of polluting installations. There is also a claim that the engineering firms hired by the City of New York to evaluate potential sites are biased in favor of the Jerome Park Reservoir because they were previously hired by the City of New York to design a filtration plant at that site.

These comments are not a basis for rejection of the Consent Decree. This litigation seeks only to enforce the filtration determination, and the Consent Decree does not itself determine the location of the filtration plant but recognizes that the siting decision will be made by the City of New York. The concern that the December 1, 1998 date for site selection set forth in the Consent Decree will prevent full environmental review is also not a basis for rejection. The Consent Decree provides that December 1, 1998 is the

date on which the City, among other things, must submit its Draft Environmental Impact Statement and its "recommendation of preferred site" and must commence the final Environmental Impact Statement procedure. Thus, the Consent Decree contemplates full environmental impact review before a final site is selected.

■ One comment objects to a provision of the Consent Decree which it claims improperly confers jurisdiction on this court to hear siting issues which, in denying the motions for intervention, I had held were matters to be determined in other regulatory and judicial fora. *United States v. City of New York, supra,* 179 F.R.D. at 378. Paragraph D of the Force Majeure Section of the Consent Decree provides: "The City shall take all reasonable actions to prevent or minimize any delay.... In the event any legal action is brought which might delay performance of any of the milestones in this Consent Decree, the City shall exercise due diligence in seeking removal to this Court and in defending such action, including appeals." The Consent Decree simply imposes a duty upon the City of New York to seek removal. A removed party can contest jurisdiction. *See generally Yonkers Racing Corp. v. City of Yonkers,* 858 F.2d 855 (2d Cir.1988). Concern is also expressed that removal would replace state environmental and local land use law with federal law. But the question of jurisdiction must be distinguished from that of which law applies. If a matter is removed to this court, and the court finds that jurisdiction exists, then the court will apply state law, if applicable.

Additionally, some comments express concern that water rates will rise because of the construction of a filtration plant and that these increases will have a disproportionate impact on low income and minority members of the community. But the issue of water rate apportionment is a matter beyond the scope of this enforcement action and concern with that issue cannot be a sound basis for rejecting a Consent Decree aimed at assuring the public, including those who cannot afford to buy bottled water or install home filtering devices, that the water coming from their taps is drinkable.

Some comments complain that the monitoring and reporting requirements included in the Consent Decree as a way for the federal and state governments to monitor the City's compliance are insufficient and that the public should be given access to all City documents. Review of the substantial monitoring and reporting requirements in the Decree persuades me that there is no reason to reject the provisions that the agencies charged with enforcement have accepted.

Other comments challenge the imposition of penalties on the City. The penalties, aimed at deterrence as well as protection of the Watershed, were bargained for between the United States and the City (the State chose not to seek penalties). They are within the statutory authority for penalties and are less than the City might have faced under the SDWA had it chosen not to resolve the action with the Consent Decree.

Finally, I turn to the suggestion that the construction and existence of a filtration plant will lead to further degradation of the water supply by encouraging greater to lerance of pollution in the Croton Watershed. It is essential to recognize that the Consent Decree's requirement that a filtration plant be built does not lead inevitably to such a result. Nothing in the Consent Decree limits the City of New York, the State of New York and the EPA from pursuing their expressed recognition of the critical role of watershed protection in assuring a pure water supply. Nor does it limit protective activity on the part of Watershed communities, community organizations or individuals. Whether activities which enhance pollution of the watershed will be tolerated, and whether the availability of filtration will play a role in regulatory or local land use determinations, depends upon how concerned parties conduct themselves in the future. Ironically, the public comments on the Consent Decree suggest that support for greater watershed protection was galvanized by the filtration plant controversy. The Consent Decree in no way limits further efforts to protect the Croton Watershed.

**Evaluation of Consent Decree**

■ Before entering a consent decree, a district court must be satisfied that the de-

cree: (1) springs from and serves to resolve a dispute within the court's subject-matter jurisdiction; (2) comes within the general scope of the case made by the pleadings; and (3) furthers the objectives of the law upon which the complaint was based. *Kozlowski v. Coughlin,* 871 F.2d 241, 244 (2d Cir.1989) (citing *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 525, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986)); *Cronin v. Browner,* 898 F.Supp. 1052, 1063 (S.D.N.Y.1995). Acceptance of a settlement agreement is especially appropriate "where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial expertise in the environmental field." *Cronin v. Browner, supra,* 898 F.Supp. at 1063 (quoting *United States v. Cannons Engineering Corp.,* 899 F.2d 79, 84 (1st Cir.1990)).

The court has subject matter jurisdiction over this federal enforcement action pursuant to Section 1414(b) of the SDWA, 42 U.S.C. § 300g–3(b). Supplementary jurisdiction over the state law claims exists under 28 U.S.C. § 1367.

The proposed Consent Decree indisputably falls within the scope of the case as set forth in the complaints of the United States and the State of New York. These complaints seek to enforce federal and state laws, described above, the purpose of which is to assure that public water systems meet minimum standards for the protection of the public health by requiring the filtration and disinfection of surface water systems unless filtration avoidance criteria have been met.

The Consent Decree promotes the objectives of federal and state law by setting forth detailed milestones which the City of New York must meet in order to assure the planning, construction and operation of a water treatment plant which will filter and disinfect the water distributed to the people of New York City from the Croton Water Supply System. Given the City's past failure to comply with the filtration requirement, the Consent Decree both imposes civil penalties and stipulates further penalties to deter future violations.

Under the supervision of a United States Magistrate Judge, the Honorable Steven M. Gold, three public entities, the United States, acting on behalf of the EPA, the State of New York and the City of New York have labored extensively, and at arms length, to effect a settlement in this litigation. Their efforts produced a Consent Decree designed to resolve the substantial issues in this case and save the public they represent the time and expense of further litigation.

For all of the reasons set forth above, the Consent Decree, which enforces compliance by the City of New York with the federal and state requirement that it filter and disinfect the water in the Croton Water Supply System, is approved without modification.

## CONCLUSION

The proposed Consent Decree will be entered. The United States is directed promptly to send a copy of this Memorandum and Order to all those who filed a public comment.

**SO ORDERED.**