UNITED STATES of America,
Plaintiff,

State of New York and Barbara Debuono, M.D., as Commissioner of the New York Department of Health, Plaintiffs–Intervenors,

v.

CITY OF NEW YORK and New York City Department of Environmental Protection, Defendants.

Norwood Community Action,
Lina Burger, and Fay
Muir, Plaintiffs,

v.

Department of Environmental Protection, Department of Citywide Administrative Services, City Planning Commission, and City of New York, Defendants.

Friends of Van Cortlandt Park and the Parks Council, Inc., Plaintiffs,

v.

City of New York, New York City Department of Environmental Protection, New York City Planning Commission, New York City Council, New York City Department of Parks & Recreation, Rudolph W. Giuliani, Joel A. Miele, Sr., and Henry Stern, Defendants.

Nos. 97 CV 2154 NG SMG, 99 CV 6224 NG SMG, 99 CV 7399 NG SMG.

United States District Court,
E.D. New York.

May 12, 2000.

Eliot Spitzer, Attorney General of the State of New York, New York State Department of Law, Environmental Protection Bureau, New York City, for plaintiff-intervenor State of New York; Gordon J. Johnson (GJ 7379), Norman Spiegel (NS 5619), Assistant Attorneys General, of counsel.

Jack L. Lester, New York City, for plaintiffs Norwood Community Action, Lina Burger, Fay Muir.

Schulte Roth & Zabel LLP, New York City, for plaintiff Friends of Van Cortland Park and Parks Council, Inc.; Howard B. Epstein, (HB 8484), Theodore A. Keyes, (TK 8484), Peter C. Trimarchi, (PT 4208), Jess Velona, (JV 6027), of counsel.

Michael D. Hess, Corporation Counsel of the City of New York, New York City, for defendants City of New York, and New York City Dept. of Environmental Protection; Inga Van Eysden (IV3570), of counsel.

Michael D. Hess, Corporation Counsel of the City of New York, New York City, for Defendants City of New York, New York City Dept. of Environmental Protection, New York City Planning Comm'n, New York City Council, New York City Dept. of Parks & Recreation, Rudolph W. Giuliani, Joel A. Miele, Sr., and Henry J. Stern; Inga Van Eysden, of counsel.

## OPINION AND ORDER

GERSHON, District Judge.

On November 24, 1998, I approved a Consent Decree resolving claims brought by the United States, acting on behalf of the Environmental Protection Agency ("EPA"), and the State of New York against the City of New York to require the City to provide filtration and disinfection treatment for its Croton Water Supply System. *United States v. City of New York,* 30 F.Supp.2d 325 (E.D.N.Y.1998). The Consent Decree enforces compliance by the City with federal and state requirements that it filter and disinfect the water, requirements with which the City had previously failed to comply despite its agreement to do so.

The Consent Decree establishes detailed "milestones" that the City must satisfy in order to fulfill its obligation to plan, design, construct and operate a Water Treatment Plant ("WTP") at a site selected by the City after its completion of an environmental review. The Consent Decree requires the parties to attempt to resolve disputes arising under it, and the court retains jurisdiction to determine unresolved disputes. The Consent Decree further requires the City to diligently seek removal to this court and to defend against any action which might delay performance of any of the milestones.

The actions presently before me, which were argued together, arise out of the City's selection of the Mosholu Golf Course

site in Van Cortlandt Park in the Bronx as the location for construction and operation of the WTP. The City's plan calls for the plant to be built under a golf driving range presently on the site. The driving range will be demolished during construction and then rebuilt after the gradient of the parkland is altered to accommodate the WTP, under the City's plan. In 97 CV 2154, the action which was resolved by the Consent Decree, the State of New York, through its Attorney General ("AG"), seeks relief under the dispute resolution provision of the Consent Decree, claiming that both the WTP itself, and the disruption entailed for its construction, involve alienation of parkland and that, as a result, the City is required to seek the approval of the State Legislature for the proposed project. Since the City has not sought such approval, the AG asserts that the City has failed to meet its milestone obligations to request and obtain State legislative approval by specific dates that have now passed. The City disputes the AG's contention that State legislative approval is required to undertake the project as it has been designed.

The other two actions, 99 CV 6224 ("Norwood") and 99 CV 7399 ("Friends"), were instituted by community groups and concerned citizens as proceedings in New York State Supreme Court, Bronx County, under Article 78 of the New York CPLR and for declaratory and injunctive relief, seeking to annul the City's selection of the Mosholu Golf Course site for construction of the WTP. Without objection, the City has removed both actions to this Court pursuant to the Consent Decree. The plaintiffs in both Norwood and Friends, like the AG, argue that the City was required to obtain State legislative approval for construction of the WTP at the chosen site. Friends also argues that an amendment of the New York City Zoning Resolution was required before the City could lawfully undertake this project in a park. Friends further argues that the approvals of the project by the responsible City agencies were invalid because the City

failed to adequately address and resolve the issues of need for legislative approval and a zoning amendment, and because the City's environmental review failed to give adequate consideration to preservation of the Clubhouse of the Mosholu Golf Course, which, under the City's plan, will be demolished during excavation of the WTP site, and replaced by a replica when construction is completed. The City has moved for summary judgment in Norwood and Friends, and the plaintiffs in Friends have cross-moved for partial summary judgment on the park alienation and zoning amendment issues.

All parties agree that there are no disputes of material fact and no need for discovery on the issues of whether State legislative approval or amendment of the Zoning Resolution are required, which present questions of law, and Friends identifies only a narrow area of possible factual dispute in the remainder of its claims. For the reasons that follow, the State's application under the Consent Decree is denied, the City's motions for summary judgment in Norwood and Friends are granted, and the cross-motion by plaintiffs in Friends for partial summary judgment is denied.

## BACKGROUND

The background of the Croton Water Supply System, the statutory and regulatory requirements, federal and state, applicable to ensuring a safe drinking water supply, the events leading up to the action by the United States and the State to enforce compliance with the requirement of filtration of the Croton Watershed, and the salient terms of the Consent Decree, are described in my prior opinions approving the Consent Decree, 30 F.Supp.2d 325 (E.D.N.Y.1998), and denying certain motions to intervene, 179 F.R.D. 373 (E.D.N.Y.1998), and the opinion of the Second Circuit affirming denial of intervention, 198 F.3d 360 (2d Cir.1999). It is

therefore necessary only to summarize some of these facts in this opinion.

The Safe Drinking Water Act ("SDWA"), 42 U.S.C. § 300g–1 et seq., and the Surface Water Treatment Rule ("SWTR") promulgated by the EPA thereunder, 40 C.F.R. §§ 141.70–75, effectively mandated filtration of public water systems using surface water, with limited exceptions. In 1992, the State Sanitary Code ("SSC") was amended to comply with the federal requirements.

The Croton Watershed is one of three principal areas supplying drinking water to the City and surrounding communities; the others, the Delaware and Catskill Watersheds, are located in more remote and less developed regions than Croton. The Catskill and Delaware Watersheds so far have been permitted to avoid filtration. The Croton Watershed has an area of 375 square miles, primarily in Westchester, Dutchess and Putnam Counties of New York State. It normally supplies approximately ten percent of the City's water requirements, but can provide approximately thirty percent during a drought.

In 1991, a City report concluded that filtration treatment of water from the Croton Watershed would eventually be required to ensure its safety. In 1992, the City entered into a stipulation with the New York State Department of Health pursuant to which the City acknowledged that it was required by federal and state law to build a filtration plant for the waters of the Croton Watershed. On January 13, 1993, the EPA issued a determination requiring the City to filter and disinfect water from the Croton Watershed. When the City failed to comply with the 1992 stipulation or the 1993 EPA ruling, the United States commenced an action in this Court in 1997, joined by the State and the State Department of Health as intervenors, to compel compliance with federal and state laws and regulations governing public water systems with respect to the Croton Watershed. The parties entered into settlement discussions under the supervision of Magistrate Judge Steven M. Gold, resulting in the proposed Consent Decree which I approved without modification after allowing for public comment on the proposed settlement and carefully considering the comments received.

The Consent Decree provides injunctive relief requiring the City to finish the planning, designing, construction and operation of the WTP at a site selected by the City after completing its environmental review. Under state and local law, any environmental review must comply with the requirements of the State Environmental Quality Review Act ("SEQRA"), N.Y. Environmental Conservation Law §§ 8–0101 et seq., the State regulations thereunder, 6 N.Y.C.R.R. §§ 617.1 et seq., and the City's rules adopted in furtherance of that Act, the City Environmental Quality Review ("CEQR"), 62 R.C.N.Y. §§ 5–01 et seq. & 43 R.C.N.Y. §§ 6–01 et seq. The "milestones" agreed to in the Consent Decree prescribe particular steps the City is required to take by specified dates through completion of construction of the WTP by September 1, 2006, and commencement of its operation by March 1, 2007. The City agreed to commence performance of the milestones in the Consent Decree before its approval by the court, and the City did so. The City identified eight potential sites for the WTP, issued a preliminary report evaluating the advantages and disadvantages of each, and publicized its content for public comment and public hearings. Three of these sites, including the site eventually chosen, are located in Van Cortlandt Park. The City had to compile a list of necessary permits and approvals for all sites under consideration by September 1, 1998, and the City's list did not include approval of the State Legislature for any of the parkland sites. Other milestones required the City to request State legislation and a home rule message from the City Council by July 31, 1999, "in the event that use of the selected site for the WTP requires state legislation," and to obtain

that legislation "if necessary" by February 1, 2000. The City must pay substantial stipulated penalties if it fails to comply with the milestones, including escalating per day penalties, in addition to the civil penalty it agreed to for past failure to comply with federal requirements.

In December, 1998, the City announced its selection of Mosholu Golf Course as the preferred site, completed a Draft Environmental Impact Statement ("DEIS"), and began a process of public comment, public hearings and review, pursuant to the procedures mandated by SEQRA and CEQR and the City's Uniform Land Use Review Procedure ("ULURP"), N.Y.C. Charter § 197–c. A Final Environmental Impact Statement ("FEIS") was completed in May 1999. Numerous critical comments were received during the review process, including assertions by the private plaintiffs in these actions and others that the proposed project required State legislative approval and amendment of the City Zoning Resolution. No comments were received during public hearings from representatives of any agency of the State, including the AG, although attorneys in the AG's office informally advised City attorneys of their view that State legislation was required, a position rejected by the City Corporation Counsel.

This review process culminated in approval by the City Planning Commission on June 1, 1999 of the Mosholu Golf Course site for the WTP, and approval by the City Council of the City Planning Commission decision on July 21, 1999. The City Council determined that the FEIS satisfied the requirements imposed by law for environmental review, that the project minimized adverse environmental effects to the maximum extent practicable, and that, after consideration of the relevant environmental issues, land use implications and other policy issues, the project should be approved. The City Council modified the City Planning Commission decision by providing approximately $20 million for preservation, restoration and improvement of the site of the project and its immediate vicinity, and for improvements elsewhere in Van Cortlandt Park.

On July 30, 1999, the AG's office sent a letter to the City stating that construction of the WTP at the Mosholu Golf Course site, as approved by the City Council, required State legislation, and that, therefore, the City had to request State legislation and a home rule message from the City Council by the following day in order to satisfy the applicable milestone of the Consent Decree. The City rejected the AG's interpretation of the legal requirements. The AG's Office has nevertheless advised the court by letter, in response to my inquiry, that "the Attorney General would strongly support state legislation" approving the Mosholu Golf Course site. The letter states that the site is identified in the FEIS as the most appropriate one for the project, that it "has been selected by the New York City Council and the Mayor after their review" of the FEIS and completion of the ULURP procedure, and that the "Attorney General does not disagree with that judgment."

The selected site is located in the southeast corner of Van Cortlandt Park, occupied by a golf driving range and adjacent to the golf course itself. The golf course will be closed during construction, and the existing golf clubhouse, roads and parking area will be demolished during construction and rebuilt, as will the driving range. The driving range site will be excavated and the WTP constructed below finished grade and substantially below existing grade, although in places the finished grade will be between approximately 5 and 35 feet higher than existing grade. Upon completion of construction, the roof of the plant is to be covered with soil and restored to allow its resumed use as a golf driving range. In order to accommodate the existing sloping nature of the site, the facades of the building housing the WTP will be constructed as bermed and landscaped embankments. Air intakes for the WTP will be located adjacent to the driv-

ing range through louvers concealed in the berms around the perimeter of the building, and exhaust stacks will be integrated into the supports for the golf ball netting on the sides of the driving range and the driving range structures. The WTP includes a raw water pumping station, finished water pumping station, and treated water reservoir, all housed in the building. Underground tunnels connecting the facility with the New Croton Aqueduct and the existing water distribution system for the City also will be constructed.

The construction site will cover approximately 28 acres of the 74 acre golf course. Van Cortlandt Park itself covers 1,146 acres and, together with other areas of open space in the vicinity, make the area strikingly bucolic for a densely populated part of the City. According to the FEIS, the temporary loss of active open space during construction will decrease the total open space ratio from 26 to 23 acres per thousand residents. This compares to the recommended ratio of 2.5 acres per thousand residents specified in the CEQR as a goal. Friends concedes that this temporary reduction in the open space ratio during construction is not significant. (Friends' Response to City's Local Rule 56.1 Statement ¶ 29). The FEIS estimates that 268 trees will be removed during construction. The City plans a reforestation program, but the rebuilt driving range will be replanted with grass only because of the plant underneath. The construction project will be a substantial one, with the use of heavy equipment and vehicular traffic that would be expected in an undertaking of that scale. The City is required to complete construction within 5½ years of its commencement under the applicable milestones.

## DISCUSSION

### A. The Park Alienation Issue

■ The AG, Friends and Norwood contend that parkland in the State may not be diverted to any uses that are not recreational or otherwise consistent with the public use and enjoyment of a park, in the absence of specific approval by the State Legislature.[1] They rely upon the common law doctrine against alienation of parkland, and upon Sections 20(2) and 20(7) of the General City Law, which provide that the "rights of a city in and to its ... parks, and all other public places, are hereby declared to be inalienable," with exceptions allowing a city to sell and convey property upon "discontinuance" of public use or where authorized by another law, exceptions that, they contend, do not apply in this case.[2] The AG and the private plaintiffs further argue that the requirement of State legislative approval applies even to an underground facility located under parkland. They also argue that the scale and duration of the construction project alone, and the consequent disruption of park use while the plant is being built, require State legislative sanction, even if the court were to find that the City can build and operate an underground facility under parkland without the authorization of the State Legislature.

The City contends that construction of the WTP does not entail alienation of parkland requiring State legislative approval (1) because there will be no conveyance of parkland to another entity, public or private, and (2) because the plant, upon

---

1. The issue of parkland alienation is properly raised by plaintiffs in Norwood and Friends. The State's interest in the issue is direct and immediate and, therefore, the AG has been permitted to participate in the litigation without the court's resolving the question, initially raised by the court and since addressed by the parties, whether the AG is properly before the court under the dispute resolution provisions of the Consent Decree or in another capacity.

2. The AG, unlike the private plaintiffs, recognizes an exception to the requirement of legislation, which he derives from other laws relating to water supply projects, but only, according to the AG, if the project has been formally approved by the responsible State agency, the Department of Environmental Conservation ("DEC"). The City did not seek DEC's formal approval for installation of the WTP on the Mosholu Golf Course site.

completion, will be located underground and the parkland available for public use after restoration will remain essentially undiminished. The City further contends that the temporary disruption of the public use of parkland occasioned by the construction of a project that is otherwise permissible can be approved by the City, without the need for State legislation or the approval of a State agency. For the reasons that follow, I agree with the City.

The leading New York Court of Appeals decision on park alienation is *Williams v. Gallatin,* 229 N.Y. 248, 128 N.E. 121 (1920), which held that, once land has been dedicated to use as a park, it cannot be diverted for uses other than recreation, in whole or in part, temporarily or permanently, even for another public purpose, without legislative approval. *Williams* invalidated the proposed lease of the Arsenal Building in Central Park to the Safety Institute of America, a non-profit, quasi-public organization, for exhibits and instruction on safety devices. *Williams* involved "alienation" of public land in its traditional sense of a conveyance to a private entity, but its sweeping language has been construed also to prohibit "alienation" by allowing any use of parkland for non-recreational purposes whether by the municipality or another entity, public or private. Although *Williams* speaks eloquently of the need to preserve parkland, the decision does not resolve the question presented here. The Court stated, for example: "no objects, however worthy, ... which have no connection with park purposes should be permitted to *encroach upon it* without legislative authority plainly conferred," *id.* at 253, 128 N.E. 121; a public park should "not be *turned over* by the commissioner of parks to other uses," *id.* at 254, 128 N.E. 121; and a park "must be kept *free from intrusion* of every kind *which would interfere in any degree* with its complete use for this end," *id.* (emphasis supplied). These quotations do not speak to whether an underground plant is an encroachment or an intrusion on parkland, whether the City's allowance of an underground use to supply essential municipal services can be equated with allowing a park to be "turned over" for other uses, or whether alienation from park use exists when the surface of the park will be restored to the same uses that existed before construction of an underground project to supply essential public services. These critical distinctions from *Williams* require a different result where, as here, the City will not surrender any of its land to another entity, and the public will have undiminished use of the surface of the park as soon as construction of the WTP and landscape restoration is completed.

The AG acknowledges that the City has gone to "great lengths" and displayed "some ingenuity" in minimizing the impact of the plant on the park. The facilities comprising the project will be located underground. Although the parties quibble over the significance of the distinction between being below "finished" grade versus "current" or "existing" grade, the fact remains that the park will be restored to its existing use as a golf driving range, that the golf course and associated structures will be restored or rebuilt, and that the area available for public use for recreational purposes after the project is completed will remain undiminished.

That changes to the existing grade will occur in some areas to accommodate the plant is immaterial. As the City points out without contradiction, no authority requires a municipality to seek State legislative approval to make changes to the gradient of parkland; in fact, the Mosholu Golf Course and driving range were created in approximately 1914 by altering the natural landscape. Moreover, neither *Williams* nor any other authority drawn to the court's attention prohibits underground use of parkland for non-recreational purposes related to a municipality's need to deliver essential services to its residents, as is the case here, without legislative approval, where that use will not interfere with the recreational use of the

surface. (See pp. 204–205 *infra*). Since the parkland available for public use will not be reduced, this underground use of parkland may be approved by the City without the need for ratification by the State Legislature.

▮ Nor is State legislative approval a precondition to the temporary disruption of parkland necessarily occasioned by the construction of a project that is properly undertaken without specific legislation. On the contrary, in *Wigand v. City of New York*, N.Y.L.J., Sept. 25, 1967, p. 21, col. 5 (Sup.Ct., Richmond Co.), the court upheld the City's authority to construct two underground water storage tanks at Silver Lake Park on Staten Island, without State legislative approval, that were needed to meet anticipated needs of a growing population. As in this case, the Parks Department collaborated with the municipal water authorities (the predecessor of the City Department of Environmental Protection ("DEP")) and approved the specifics of the project, including restoration and beautification of the surface, to ensure preservation of the landscape for appropriate park use after completion of construction, which was estimated to take 30 months. The storage tanks would be below the finished surface, but, as with the Mosholu Golf Course project, the grade would be changed to incorporate a "well designed building" built into the slope and "virtually hidden by the surrounding landscaping." The roof of the building would be made into a patio with benches for the public.

*Wigand* rejected the argument that the temporary disruption of parkland necessarily occasioned by the construction project violated the park alienation doctrine or barred the City from carrying out this vital project. The court also rejected the argument that the underground use of the land implicated the prohibition against "encroachment upon the use of park lands

and a diminution of the use of the said lands." The court further pointed out that the Parks Department and the Board of Water Supply had cooperated "in the installation of numerous tunnels and shafts in the various parks for a period of more than 50 years."

▮ The court specifically framed the issue it decided as whether the project was "compatible with public park purposes," and found that it was. As in the present case, the project was approved by the appropriate City agencies and its legislative body (the Board of Estimate at the time), not by the State Legislature. The AG's attempt to distinguish *Wigand* by claiming that it rested on the approval of the Silver Lake Park project by the State Water Resources Commission (which the AG claims provides an exception to the requirement of legislative approval) is misplaced, since the opinion does not indicate that the State agency considered the parkland alienation issue or that the court relied upon its concurrence for anything other than, as the opinion states, evidence that the project "is a matter of state concern."[3] In this case, too, the AG has informed the court that the State (*i.e.*, its executive branch through its authorized spokesperson, the AG), approves of the project and believes it should be built at the site chosen by the City. See pp. 200–201 *supra*. And the State, as a party to the prior litigation and the Consent Decree, sought and obtained the City's commitment to construction of the WTP as necessary to ensure the safety of the Croton water supply. See also *Wetter v. Moses*, 86 N.Y.S.2d 110 (Sup.Ct., N.Y.Co. 1941), *aff'd without opinion*, 265 A.D. 993, 39 N.Y.S.2d 992 (1st Dep't), *app. dismissed*, 290 N.Y. 761, 50 N.E.2d 100 (1943) (upholding the general authority of the Parks Commissioner to close a public park

**3.** The requirement of formal state agency approval of a water project in N.Y.C.Admin.Code § 5–426, relied upon by the AG, which requirement is triggered when con-demnation procedures are needed for water supply projects, does not apply to the WTP. Because the City already owns the land, no acquisition of land is required.

during construction of a vital municipal project).

In this case, as in *Wigand*, no alienation of parkland will occur, in either sense in which the term has been used in New York cases that protect parkland. The land will remain in the City's ownership, possession and control during and after construction, so there will be no transfer of an interest in land to another entity. And, since there will be no diminution of parkland available for public use after the plant is built, underground use of the parkland is not an alienation in the sense of diversion of parkland for non-park purposes.

No other authority of which the court is aware requires State legislative approval for an underground project to meet essential municipal needs under circumstances comparable to those presented here. State decisions which disallowed the use of parkland for non-park purposes, or "temporary" alienation of parkland without State legislative approval, many of which relied upon an interpretation of New York General City Law §§ 20(2) and 20(7) that sharply restricted municipal home rule, as well as upon the common law prohibition of alienation of parkland, arose in entirely different contexts.[4] In each of these cases, the challenged action involved either a transfer of parkland to a private entity, or use of above-ground parkland for non-recreation purposes that were inconsistent with the land's dedication to use as a park, thereby limiting the public's use or enjoyment of parkland or a portion of it. See, e.g., *Miller v. City of New York*, 15 N.Y.2d 34, 255 N.Y.S.2d 78, 203 N.E.2d 478 (1964) (lease to private entity to develop parkland for golf driving range disallowed as beyond Parks Commissioner's authority); *Matter of Ellington Constr. Corp. v. Zoning Bd.*, 152 A.D.2d 365, 549 N.Y.S.2d 405 (2d Dep't 1989), *aff'd on other grounds*, 77 N.Y.2d 114, 564 N.Y.S.2d 1001, 566 N.E.2d 128 (1990) (conveyance of parkland to private developer required approval of State legislature); *Ackerman v. Steisel*, 104 A.D.2d 940, 480 N.Y.S.2d 556 (2d Dep't 1984), *aff'd on opinion below*, 66 N.Y.2d 833, 498 N.Y.S.2d 364, 489 N.E.2d 251 (1985) (supposed "temporary" allowance, for periods of 25 and 14 years at time of litigation, by Parks Commissioner for storage of trucks and equipment above ground by Highway and Sanitation Departments in Cunningham Park in Queens, declared unlawful); *Stephenson v. County of Monroe*, 43 A.D.2d 897, 351 N.Y.S.2d 232 (4th Dep't 1974) (sanitary landfill in park enjoined despite vague "speculation" that the mountain of garbage would eventually be made into a ski slope); *American Dock Co. v. City of New York*, 174 Misc. 813, 21

---

**4.** Given my conclusion that construction and operation of the WTP will not constitute alienation of parkland within the meaning of established State law, I do not address the current vitality of cases that have construed General City Law §§ 20(2) and 20(7) to deprive municipalities of the power to discontinue parkland without approval of the State Legislature. It also is unnecessary to consider whether any already existing enactments give the City power to discontinue use of parkland for a water supply project, for the provision of vital municipal services more generally, or for other purposes as determined by the City, even if the General City Law provisions are as restrictive as the AG argues. The AG acknowledges that state laws of general application may authorize discontinuance of parkland for public purposes and that such laws obviate a city's obtaining State legislative approval for each particular project. *See Grayson v. Town of Huntington*, 160

A.D.2d 835, 554 N.Y.S.2d 269 (2d Dep't), *lv. denied*, 76 N.Y.2d 714, 564 N.Y.S.2d 718, 565 N.E.2d 1269 (1990); and *Village Green Realty Corp. v. Glen Cove Community Dev. Agency*, 95 A.D.2d 259, 466 N.Y.S.2d 26 (2d Dep't 1983), which upheld alienation of parkland property, for low-income housing or other urban renewal projects, without the specific approval of the State legislature for either use. The courts did so on the basis of general authorizations for use of city property for such purposes in Public Housing Law § 123 and General Municipal Law § 503–a(4), respectively. See also *Sierra Club v. Board of Educ.*, 127 A.D.2d 1007, 512 N.Y.S.2d 954 (4th Dep't), *lv. denied*, 70 N.Y.2d 612, 523 N.Y.S.2d 496, 518 N.E.2d 7 (1987) (construing provision of Buffalo City Charter, notwithstanding N.Y.Gen.City L. § 20(2), to allow city to use part of its parkland for a public school or other non-park public purposes).

N.Y.S.2d 943 (Sup.Ct., N.Y.Co.1940), *aff'd without opinion*, 261 A.D. 1063, 26 N.Y.S.2d 704 (1st Dep't), *aff'd without opinion*, 286 N.Y. 658, 36 N.E.2d 696 (1941) (lease of wharf area to private entity to operate a foreign trade zone invalidated); *Matter of Central Parkway*, 140 Misc. 727, 251 N.Y.S. 577 (Sup.Ct., Schenectady Co.1931) (local ordinance that allowed a strip of parkland to be detached to build a parkway invalidated in the absence of State legislative approval); *Tompkins v. Pallas*, 47 Misc. 309, 95 N.Y.S. 875 (Sup. Ct., N.Y.Co.1905) (Parks Commissioner lacked authority to allow advertisements to be placed on a temporary fence that had been properly erected for safety purposes in Bryant Park during construction of library).

This case does not present an issue as to the power of the City's Parks Commissioner to lease parkland to a private commercial entity, as in *Miller*. No interest in parkland is conveyed by the WTP project. Nor does this case present an issue, such as in *Ackerman* or *Stephenson*, where characterizations of the non-park use as "temporary" were subterfuges. The temporary disruption of parkland, even for the relatively lengthy period to be involved here, for construction of an otherwise permissible public project is not prohibited by the doctrine against alienation of parkland where the temporary disruption is not a subterfuge for a diversion of parkland for non-park use. Interference with public use of parkland will be limited to the time necessary for construction of the WTP and restoration of the surface. Moreover, even during the height of construction, large areas of parkland and other open space will remain, with all of the rest of Van Cortlandt Park and other local areas of greenery available for use by residents and the general public. And the City Council, in approving the project, directed that approximately $20 million be transferred to the Parks Department to ameliorate the effects of the construction and to preserve, restore and improve the site of the project, its immediate vicinity, and Van Cortlandt Park generally.

The AG acknowledges that there is no case law which requires the City to obtain approval of the State Legislature before the City can install its own infrastructure beneath its parkland. It is not disputed that underneath City parkland are many non-park facilities that benefit the City generally and do not serve just the parkland above, including water tunnels, sewer facilities and public utility lines. Nor is it disputed that many of these projects could not have been built or maintained without temporary disruption of the park surface for construction and upkeep.[5] New York

---

5. On oral argument, questions arose as to whether these projects had in fact been approved by the State Legislature and as to the significance of past practices. I afforded the parties an opportunity to submit supplemental affidavits and briefs directed to this issue. The AG and the private plaintiffs argue that State legislative approval has often been obtained for infrastructure projects, and the AG argues further that, even if some projects were not authorized by State legislation, these instances do not estop the State from enforcing compliance with legal requirements. Their supplemental submissions cite many examples where the State Legislature enacted legislation authorizing conveyance of parkland or easements in parkland for such projects, but these examples involve circumstances that are not comparable to the WTP project. Notably, the examples of State legislative approval furnished by the AG and the private plaintiffs involve in most instances the conveyance of interests in parkland from a government entity to either a different government entity (*e.g.*, from a town to a county or to a sewer district) or to private entities, which is classic alienation of parkland. A typical example cited by the AG is L.1980, c. 390, authorizing the City of Peekskill to convey a permanent easement on parkland to Westchester County for construction and maintenance of a sewer. Such examples do not establish that State legislative approval is required where no interest is conveyed to a separate government entity. Indeed, the Legislature also approves the conveyance of parkland from one government entity to another for its continued use as parkland, as with Peekskill's conveyance of parkland to the County in a law, L.1980, c. 389, immediately preceding enactment of the law relied upon by the AG.

State law relating to alienation of parkland does not require approval by the State Legislature of every City infrastructure project underneath parkland, and State legislative approval is not required for the WTP project, which will not diminish the parkland available for public use when construction is completed.

### B. Zoning Amendment

██ Friends argues that an amendment of the City Zoning Resolution is required for construction and operation of the WTP at the Mosholu Golf Course site. Parkland is not included in any zoning district. Section 11–13 of the Zoning Resolution provides that, when a public park is "sold, transferred, exchanged, or in any other manner relinquished from the control of the Commissioner of Parks and Recreation," no use will be permitted on the "former public park or portion thereof" until an amendment designating a zoning district has been adopted. The amendment requirement is inapplicable here.

The WTP does not create a "former public park or portion thereof" that would give rise to the need for a zoning amendment. When the project is completed, the area of parkland available for public use will remain substantially the same as it is now, and no portion of parkland will be placed beyond the control of the Parks Commissioner during or after construction of the WTP. No portion of Van Cortlandt Park will become a residence, commercial or manufacturing district—the three general categories of zoning districts under Section 11–12 of the Zoning Resolution—that must be designated as such on a zoning map.

Moreover, the City Planning Commission, the agency responsible for all zoning matters including amendments, was aware of Friends' argument, which was made before it, and did not deem a zoning amendment to be necessary. The City Council approved the Planning Commission decision. Thus, the entities responsible for land use matters, the City Planning Commission and the City Council, carefully reviewed and considered all relevant factors based on a comprehensive Environmental Impact Statement and approved the project only after allowing extensive opportunities for public comment and hold-

Other instances cited entail discontinuance of the use of parkland or a portion of the surface of it, unlike here, where the City will fully restore the surface to its use as parkland. See L.1988, c. 371 (authorizing Town of Greenburgh to construct and operate an underground water pipeline and at-grade pumping station); L.1998, c. 497 (expansion of West 72nd Street subway station; authorizes conveyance of City parkland to Metropolitan Transportation Authority); L.1980, c. 396 (City of Dunkirk authorized to engage in exploration and development of natural gas fields on parkland). The parties' references to certain laws authorizing construction of rail and subway lines are unhelpful. The railroad and subway companies were privately owned when the 1875 and 1891 laws cited by the AG were enacted. The 1875 law expressly prohibited use of parkland for railway routes, L.1875, c. 606, § 4, and limited the authority of the railway commissioners to permit use of parkland to facilitate construction. Id. § 26, ¶ 5. Subsequent laws modified this prohibition in limited respects so as to allow construction of subway lines and certain stations under parkland, L.1891, c. 4, § 4, or to allow a railway line to use or acquire interests in parkland. L.1909, c. 558. Later State legislation eased restrictions on use of City parkland for railway projects. See N.Y. Rapid Transit L. § 50(f). No State statute cited by the parties imposes similar prohibitions or restrictions on the use of land underneath parks for water supply projects, and the WTP will not be privately owned.

The compilation of statutes by the AG and the private plaintiffs is more striking for the paucity of State legislation relating either to underground use of parkland in New York City for City-owned infrastructure or to temporary interference with parkland for construction of projects under parkland to supply essential services to the residents of the City. The historical record of legislative enactments, to the extent it has been presented to the court and is argued to be a reliable reflection of legal requirements, does not support the AG's position. If anything, the historical record supports the view that, despite the well-established doctrine against alienation of parkland, no State legislative approval is required for the WTP.

ing public hearings. There is no basis under the City Zoning Resolution for rejecting their decision, made after a full airing of the issues raised here, that the WTP should be built at the site selected.

## C. SEQRA Issues

### 1. Treatment of Legislation and Amendment Issues

■ Insofar as Friends claims that the SEQRA review was inadequate because the City failed to state that approval of the State Legislature and amendment of the Zoning Resolution were required, my determination that the City was correct as to these issues is dispositive. Insofar as Friends asserts that the City should have revealed that attorneys for the State disagreed with the City attorneys, I decline to invalidate the approval process for failure to set forth the views of others whom I have concluded were mistaken. In any event, SEQRA review is not the place for resolution of such issues. *WEOK Broadcasting Corp. v. Planning Bd.*, 79 N.Y.2d 373, 382, 583 N.Y.S.2d 170, 592 N.E.2d 778 (1992) (alleged non-compliance with local zoning laws not a valid basis for rejecting application under SEQRA).

Moreover, the responsible City entities, including DEP, the City Planning Commission and the City Council were cognizant of the arguments that legislative approval and a zoning amendment were necessary. Among other things, Friends had advanced its positions in a letter to the City Planning Commission, and 34 members of the State Assembly sent a letter to the Mayor and Council Speaker maintaining that the project required approval of the State Legislature. The dissenting Commissioner on the Planning Commission addressed both the alienation and rezoning issues and attached supporting materials on those subjects and others as exhibits to the dissent. The City Planning Commission specifically addressed the zoning issue, finding that the Zoning Resolution did not apply to this parkland site.

In light of these conclusions, there is no reason to order discovery, as requested by Friends, as to conversations by City attorneys with various individuals concerning the merits of the State legislation issue.

### 2. Mosholu Golf Course Clubhouse

■ Friends' sole challenge to the substance of the SEQRA review arises from the City's decision to demolish the clubhouse that is located on the site and to build a replica after construction of the WTP. There is no merit to this challenge. Not only did the City satisfy its obligation to carefully examine this issue, it raised the issue on its own; indeed, the *only* expression of concern for the clubhouse during the entire process of review and approval emanated from the City DEP as the agency which prepared the FEIS. None of the many persons and entities, public or private, including Friends, who appeared at the hearings or made written submissions objected to demolition of the clubhouse before this Article 78 proceeding was brought. Friends' belated discovery of the issue is properly considered against it. *Jackson v. New York State Urban Dev. Corp.*, 67 N.Y.2d 400, 427, 503 N.Y.S.2d 298, 494 N.E.2d 429 (1986) ("[P]etitioner's silence cannot be overlooked in determining whether the agency's failure to discuss an issue in the FEIS was reasonable. The EIS process is designed as a cooperative venture, the intent being that an agency have the benefit of public comment before issuing a FEIS and approving a project; permitting a party to raise a new issue after issuance of the FEIS or approval of the action has the potential for turning cooperation into ambush").

The FEIS prepared in this matter is a comprehensive document which amply satisfies the City's obligation to explore and evaluate all potential adverse impacts. It examines all relevant areas of environmental concern, including impact on the surrounding neighborhood, aesthetics, open space, traffic, pollution, noise, effect on growth, infrastructure, historic and ar-

cheological resources, and other areas of environmental, economic or social concern. The City also satisfied its duty to attempt to mitigate to the extent feasible any adverse impacts that were identified. The City carefully considered alternative sites and comprehensively articulated the advantages and disadvantages of each and the reasons for the selection of the Mosholu Golf Course site. Friends does not and could not seriously suggest that the City was required to forego construction of the WTP in order to save the clubhouse, and Friends does not suggest that the City could have excavated the site and constructed the plant without removing the clubhouse. Nor does Friends offer any evidence to show that the clubhouse was of such historical, aesthetic or archeological interest that the City should have taken extraordinary measures to preserve it by dismantling and relocating or reconstructing it, as Friends now argues.

The City met its obligations under SEQRA by identifying destruction of the clubhouse as an adverse impact, disclosing relevant information available to it relating to the clubhouse, considering the alternatives to alleviate adverse impact, and deciding that preservation of a photographic record, from which a replica will be built, was the most practicable alternative. Friends' challenge to the adequacy of the City's examination of the matter during the environmental review process is equally without merit. The steps taken included: examination of primary and secondary literature and maps in regional archives and libraries; interviews with long-term residents and local historians and archeologists; inspection of the site and assessment by an architectural historian; and examination of records and consultation with the City's Landmarks Preservation Commission, the State Office of Parks, Recreation and Historic Preservation, and the State Museum Education Department. Friends offers no evidence to support its speculation that, notwithstanding these measures taken by the City, the clubhouse might have been suitable for inclusion in the National Register or other landmark designation.

As with review of other agency determinations under Article 78, a SEQRA decision should be upheld unless it was "made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion." C.P.L.R. § 7803(3); see Chemical Specialties Mfrs. Ass'n v. Jorling, 85 N.Y.2d 382, 396–97, 626 N.Y.S.2d 1, 649 N.E.2d 1145 (1995). In reviewing a SEQRA determination, the court must examine whether the agency reasonably satisfied its obligations under SEQRA to identify areas of potential concern, take a "hard look" at those areas, and give a reasoned explanation for the choices, but it is not the function of the court to second-guess agency determinations or to substitute its judgment for that of the responsible public officials who discharged their obligation to evaluate the matter and consider the reasonableness of alternative courses to mitigate the impact. Jackson, 67 N.Y.2d at 414–17, 503 N.Y.S.2d 298, 494 N.E.2d 429; Neville v. Koch, 79 N.Y.2d 416, 424–25, 583 N.Y.S.2d 802, 593 N.E.2d 256 (1992). The City discharged its obligations under SEQRA in a serious and reasonable manner, and its determination must be upheld.

### 3. Adequacy of Record

In a footnote, Friends claims that the City did not satisfy its obligation in an Article 78 proceeding to file a complete record of the proceedings being reviewed, because the City did not include transcripts of the hearings and proceedings before the City Planning Commission and the City Council. This argument is meritless.

The requirement in C.P.L.R. § 7804(e) of filing a "certified transcript of the record of the proceedings under consideration" does not require that the kind of documents at issue here, minutes of public hearings held for informational purposes,

and the internal deliberations of public entities, be recorded and furnished to the court in transcript form. A hearing transcript is necessary to review adjudicative proceedings, but it is not required to review decisions in administrative or quasi-legislative proceedings that were conducted to consider proposed actions of public agencies. *Compare Petty v. Sullivan*, 131 A.D.2d 762, 517 N.Y.S.2d 60 (2d Dep't 1987) (minutes of disciplinary proceeding required), *with Save the Pine Bush, Inc. v. Planning Bd.*, 83 A.D.2d 741, 442 N.Y.S.2d 602 (3d Dep't 1981) (public hearings held by environmental quality review board, planning board and common council in approving construction project and zoning amendment properly characterized as "informational" hearings which are part of administrative or legislative proceedings that are not subject to "substantial evidence" review under C.P.L.R. § 7803(4)).

The record before the court; which includes the FEIS and all of the reports and decisions of the Planning Commission and the City Council, contains all documents necessary to resolve Friends' challenges. Moreover, there is no suggestion that the omitted transcripts—portions of which have been submitted by Friends on this motion—contain information pertinent to the specific issues raised by Friends in its SEQRA challenge, *i.e.*, demolition of the clubhouse or the legal arguments concerning the need for State legislation and a zoning amendment, that is not otherwise contained in the record.

### CONCLUSION

The application of the State, through its Attorney General, for relief pursuant to the dispute resolution provision of the Consent Decree in 97 CV 2154 is denied, and the application is dismissed. Summary judgment is granted to the City in Norwood, 99 CV 6224, and Friends, 99 CV 7399, dismissing the petitions, and the cross-motion of Friends for partial summary judgment is denied. The Clerk of Court is directed to enter judgments in accordance with this Opinion and Order.

**SO ORDERED.**