OPINION OF THE COURT
Jane S. Solomon, J.
Motion sequence numbers 001 and 002 are consolidated for disposition.
In motion sequence number 001, petitioners, Metropolitan Taxicab Board of Trade (MTBOT), Midtown Car Leasing Corp. (Midtown), Ronart Leasing Corp. (Ronart), and Linden Maintenance Corp. (Linden), move, pursuant to CPLR article 78, to annul, vacate and set aside the New York City Taxi & Limousine Commission (TLC)’s rules, passed on March 26, 2009, which impose, among other things, a reduction in the standard lease cap that taxicab fleet owners may charge per shift for vehicles that are neither hybrids nor fuel-efficient taxis. Petitioners also seek, pursuant to CPLR 7806, damages and restitution.
Petitioners represent taxicab fleet owners. Specifically, petitioner MTBOT is a trade association representing approximately 25% of the New York City taxi industry. According to MTBOT, only 11% of the taxicabs owned by its members represent hybrids. Petitioner Midtown is a private corporation leas *256 ing taxicabs to more than 800 independent drivers. Every car leased by Midtown is a Ford Crown Victoria, the current standard in the industry, which is neither a hybrid nor fuel-efficient. Petitioner Ronart is a private corporation that manages 272 taxi medallions, leases 197 medallions and vehicles to drivers, and leases the remainder of the medallions to drivers who own their own vehicles. Petitioner Linden is a private corporation that currently operates 151 medallions.
In motion sequence number 002, respondents (together, TLC) move, pursuant to CPLR 7804 (f) and 3211 (a) (2) and (7), to dismiss petitioners’ declaratory judgment claims.
The TLC is a New York City agency charged with overseeing the medallion taxicab industry, as well as other for-hire vehicles. Section 2303 of the New York City Charter authorizes the TLC to regulate, among other things, passenger fare rates and air pollution control, and the TLC has the power and responsibility to promulgate rules and implement broad public policy in furtherance of its stated authority.
Background
In September of 2008, petitioner MTBOT, and two member taxi fleets, filed an action in federal court to enjoin TLC Rules (35 RCNY) § 3-03 (c) (10)-(11), which required all new taxicabs in New York City to be either wheelchair-accessible or to have a minimum city rating of 25 miles per gallon by October 1, 2008, and a minimum city rating of 30 miles per gallon by October 1, 2009. Allegedly, the only vehicles that met these fuel standards were hybrids or clean diesel models. On October 31, 2008, the federal court preliminarily enjoined this rule, holding that such action was preempted by the federal Energy Policy and Conservation Act. (Metropolitan Taxicab Bd. of Trade v City of New York, 2008 WL 4866021, 2008 US Dist LEXIS 94021 [SD NY 2008, 08 Civ 7837].) The TLC did not appeal this ruling.
On March 26, 2009, the TLC enacted a second mandate, referred to as the Green Amendments, to reset the standard lease cap for a vehicle and medallion. (TLC Rules § 1-78 [a] [3]; § 3-03 [c] [10], [11].) Standard lease caps, the maximum amount that a taxicab owner could charge for the lease of the vehicle and medallion, were established in 1996, and, as amended in 2004, the standard lease cap is $105 for all 12-hour day shifts; $115 for the 12-hour night shifts on Sunday, Monday and Tuesday; $120 for the 12-hour night shift on Wednesday; and $129 for the 12-hour night shifts on Thursday, Friday and Saturday. Standard lease caps are subject to biennial review and reevaluation each even-numbered year.
*257 The Green Amendments modified these caps by mandating that, if the vehicle is not a hybrid electric taxicab or a clean diesel taxicab, the standard lease cap is reduced by $12 per shift, being phased in over two years. Beginning on May 1, 2009, the standard lease cap is reduced by $4 per shift for non-fuel-efficient taxicabs, and, beginning on May 1, 2010, the standard lease cap is reduced by $8 per shift. Starting May 1, 2011, the reduction would be the full $12 per shift. However, if the vehicle being used is a hybrid electric taxicab or a clean diesel taxicab, the standard lease cap may be increased by $3 per shift as of May 1, 2009. Lease rates for wheelchair-accessible vehicles remain unchanged. As indicated above, the majority of taxicabs currently in use are the fuel-inefficient Crown Victorias.
These amendments also made a procedural change in the TLC’s existing rules regarding lease caps. Under the new mandate, rather than giving “due regard” to costs and expenses of drivers and owners in setting the standard lease cap rate, the TLC, on its own initiative, would be able to modify lease caps, by rulemaking, on the basis of its assessment of appropriate policy considerations. (TLC Rules § 1-78.1 [b].)
In addition to the foregoing, the new rules prohibited lessors, as trustees for the government, from collecting sales and rental use taxes from the lessee-drivers in any amount that, when added to the charges for the lease of the vehicle and medallion, would go over the lease cap. This tax is based on the cost of leasing the vehicle, as set by agreement with the State Tax Commission. The dollar amount of the tax in question was $3 per shift at the time the rule was enacted, and is now $4.65 per shift,[1] due to recent tax increases. In other words, if the current lease agreement calls for a rental of $100.45 per shift, the lessor could still collect the tax, bringing the total received by the lessor up to the standard lease cap of $105. However, if the lease agreement specifies a shift rental for more than that amount, up to the amount of the standard lease cap, the amount of the tax, when added to the lease amount, that would be in excess of the standard lease cap could not be collected by the lessor. (TLC Rules § 1-78 [a] [4].)
According to a statement issued by the TLC incidental to this mandate, the purpose of the mandate’s enactment was to create *258 incentives for taxicab owners to buy cleaner, more fuel-efficient vehicles.
After an evidentiary hearing, on June 22, 2009, the Federal District Court for the Southern District of New York preliminarily enjoined the reduction element of the Green Amendments, holding that it forced fleet owners to purchase hybrid taxicabs, and was therefore preempted by the Federal Clean Air Act and the Federal Energy Policy and Conservation Act. (Metropolitan Taxicab Bd. of Trade v City of New York, 633 F Supp 2d 83 [SD NY 2009].) This decision is currently being appealed to the Second Circuit Court of Appeals. Petitioners moved to amend their federal pleadings by adding the instant state law claims, but, by order dated July 23, 2009, the District Court declined supplemental jurisdiction, and the present action ensued.
Petitioners’ Arguments
Petitioners’ arguments against the TLC’s new rules are threefold: first, petitioners claim that the TLC acted beyond the law when it, in effect, repealed the requirement that any adjustment to the standard lease cap necessitates a cost-basis justification; second, petitioners allege that the new rule is arbitrary, irrational and contrary to law, because it does not have any cost-basis justification, as required by New York City Charter § 2304 (c); and third, petitioners assert that the new rule contravenes state law which mandates that operators collect sales and rental use taxes from drivers, and separately state these taxes.
Petitioners state that, prior to March 26, 2009, the TLC always considered operators’ costs in setting fares and lease caps. Further, pursuant to New York City Charter § 2304 (c), although the TLC may consider any relevant factor in establishing fare rates, and by implication, lease caps, it must give
“due regard among other things ... to the gross revenues derived from operation, to the net return derived from operation, to the expenses of operation including the income of drivers or operators, to the return upon capital actually expended and the necessity of making reservations out of income for surplus and contingencies.”
According to Ray Mundy, an expert retained by petitioners for this litigation, when the TLC refined the lease cap rules in 1997, it set forth criteria for considering changes to lease rates, including drivers’ and owners’ earnings. Mundy states that these criteria for adjusting rates remained in effect until they *259 were repealed by the instant rule. (Mundy aff U 32.) The lease caps were last adjusted in 2004, by which adjustment drivers were provided with approximately 75% of the fare increase, while owners were permitted a 25% increase in revenue to compensate them for increased costs. (Id. 1I1Í 34-38.) At that time, almost all taxicabs in use were Crown Victorias. (Id. 1i 37.)
According to Peter M. Mazur, MTBOT’s general counsel, until the instant rule was enacted, the TLC always considered a cost analysis when determining fare and lease cap adjustments. (Mazur aff 1HÍ12-24.) In support of this contention, petitioners have provided the affidavit of Frank Wolak, professor of commodity price studies in the Economics Department of Stanford University, who affirms that cost analysis is generally used in regulatory price-setting processes.
Petitioners argue that the new rule, in effect, lowers their revenue without taking into consideration their costs, especially the costs involved in replacing their current fleets with hybrid or clean diesel vehicles. Petitioners assert that the old rule, TLC Rules § 1-78 (e), prohibited the TLC from “lowering] any upper limitation of lease rates . . . unless . . . the record before the Commission includes substantial evidence of reduced operating expenses of the affected medallion owners.” Petitioners maintain that the new rule, allowing the TLC to lower rates based on policy considerations, is a ploy to circumvent the federal court’s preliminary injunction. Petitioners further allege that, because the new rule does not have a grandfather provision, which would exempt Crown Victorias purchased in reliance upon the rules in existence prior to the new mandate, the TLC is attempting to punish petitioners by causing them severe economic harm.[2]
In addition, petitioners aver that the new tax rules, which increased taxes for car rentals and imposed a supplemental tax for vehicles rented in the metropolitan commuter transportation district, have caused a dramatic reduction in their profits of between 31% to 53%. Petitioners state that these new tax rules, coupled with the new TLC mandate, will cause a reduction in profits from 99% to 137% on Crown Victorias. This argument is based on the assertion that any tax that petitioners are required to collect from the drivers, which is undisputedly the *260 drivers’ tax burden, in excess of the standard lease cap amount will become petitioners’ financial obligation. Further, having petitioners deduct the tax from the lease cap operates, in practical terms, as a lease cap reduction.
Respondents’ Contentions
Respondents say that the $15 differential between the $12 reduction for non-green vehicles and the $3 increase for hybrids and clean diesel taxicabs represents a shift in the average difference in fuel costs between a Crown Victoria and the hybrids. As stated above, the reduction aspect of the amendment has been preliminarily enjoined by the federal court.
According to Andrew Salkin, the First Deputy Commissioner of the TLC, petitioners have not submitted evidence of their operating costs since 2004, and, relative to the instant litigation, specifically did not present their operating cost information at the public hearings on the subject amendments. (Salkin aff 1i1i 55-60.) Further, Salkin states that having a single maximum lease rate for every type of vehicle has created market distortion, which perpetuates fleet owners using the cheaper Crown Victorias. The purpose of the Green Amendments is to place pressure on fleet owners to purchase cleaner, more fuel-efficient, taxicabs. (Id. 1Í1Í 4-5, 23.)
According to Salkin, the TLC promulgated the amendment in compliance with the City Administrative Procedure Act, and the amendment was reviewed extensively through a public review process, which included the following:
1. Publication of the proposed amendment in the City Record on February 23, 2009, in which comments were solicited and notice of a public hearing on the amendment was given;
2. MTBOT written comments, dated March 17, 2009, in which MTBOT stated that the TLC could not lower the lease cap rates without evidence of decreased operating costs. MTBOT alleged that the fleet owners’ operating costs had increased, but provided no evidence of such cost increase, and, further, MTBOT did not claim that the proposed amendment conflicted with the New York State Tax Law;
3. A public hearing, held on March 26, 2009, at which MT-BOT commented that the TLC could not lower the lease caps without evidence of reduced operating expenses, that the TLC could not prohibit owners from collecting state sales tax, that the incentives/disincentives were punitive because they did not have a grandfather clause, that hybrids were not fit for use as *261 taxicabs, and that the TLC was micromanaging the leasing industry;
4. Comments from SmartTransportation.org, the American Lung Association, the Environmental Defense Fund, City Council Member David Yassky, individual taxicab drivers, and the New York Taxi Workers Alliance, all of whom favored the proposed amendment. {Id. 1Í1I 31-36.)
After the public hearing, the TLC voted on and passed the amendments on March 29, 2009. The amendments were reviewed by the Corporation Counsel, as required by the City Administrative Procedure Act, and were determined to be within the authority delegated by law to the TLC. (Respondents’ exhibit J.)
Respondents’ contention is that the TLC could not consider the fleet owners’ operating costs because petitioners have declined to submit evidence of their expenses since 2003. Respondents state that the owners’ operating costs, and the potential economic impact of the Green Amendments on the owners’ expenses, was first presented as an exhibit in petitioners’ moving papers, and were not part of the administrative record, so that respondents could not have acted arbitrarily in not considering evidence that was not placed before them. In opposition to this contention, petitioners have provided the affidavit of James Levinsohn, professor of public policy at the University of Michigan, who states that the fleet owners’ operating costs were accessible by means of publically available data, primarily from federal agency reports on national statistics.
Additionally, respondents state that, pursuant to TLC Rules § 1-78 (a), the TLC is required to hold biennial public hearings in March of every even-numbered year, and to solicit written comments on, among other things, owner operating expenses in order to review the standard lease cap amounts, and that the next such hearing is scheduled for March 2010. At that time, according to respondents, petitioners may submit evidence of increased operating expenses as impacted by the instant amendments.
The TLC also contends that, contrary to petitioners’ assertions, there was a wide difference in practices in the industry with respect to charging and collecting taxes. The TLC states that, prior to the instant lawsuit, petitioners only argued that the amendments conflicted with the Tax Law because it did not authorize owners to collect sales and rental taxes, not whether such taxes should be included or excluded in the lease cap *262 amount. (Respondents’ exhibit I.) Respondents state that the amendments do not prohibit owners from collecting state taxes; the amendments only prohibit owners from collecting taxes that, along with the other rental charges, would exceed the standard lease cap. Further, according to respondents, TLC Rules § 1-60 requires taxi owners to comply with all other applicable laws and regulations, which include the Tax Law.
In support of its position, the TLC has provided affidavits from Bhairavi Desai, executive director of the New York Taxi Workers Alliance, an organization with over 12,000 registered taxi driver members; Osman Chowdhury, an independent taxi driver; Stanton Shames, principal administrative associate in the TLC’s Office of Legal Affairs; and Yehuda L. Klein, associate professor of economics at Brooklyn College.
Discussion
It is an “elemental proposition that an administrative regulation will be upheld only if it has a rational basis, and is not unreasonable, arbitrary or capricious. Administrative rules are not judicially reviewed pro forma in a vacuum, but are scrutinized for genuine reasonableness and rationality in the specific context.” (New York State Assn. of Counties v Axelrod, 78 NY2d 158, 166 [1991] [citations omitted] [Medicaid reimbursement reduction found arbitrary and unreasonable because there was no evidentiary support for the agency’s action].)
“It is well-settled that a State regulation should be upheld if it has a rational basis and is not unreasonable, arbitrary, capricious or contrary to the statute under which it was promulgated. If a regulation is to be nullified, the challenger must establish that it is so lacking in reason for its promulgation that it is essentially arbitrary.” (Kuppersmith v Dowling, 93 NY2d 90, 96 [1999] [citations and internal quotation marks omitted].)
Petitioners’ initial challenge to the TLC’s new rules concerns the TLC’s ability to nullify section 1-78.1 of its earlier rules, which required the TLC to give “due regard” to the fleet owners’ costs when modifying the standard lease cap. The new version of the rule, passed immediately before the passage of the Green Amendments, now provides that “the Commission may initiate lease cap changes at any time, based on the Commission’s assessment of appropriate policy considerations.” (TLC Rules § 1-78.1 [b].)
Pursuant to New York City Charter § 2303, the TLC’s enabling statute, the TLC is afforded a broad grant of authority to *263 promulgate and implement a pervasive regulatory program for the taxicab industry. (Id.; Matter of New York City Comm, for Taxi Safety v New York City Taxi & Limousine Commn., 256 AD2d 136 [1st Dept 1998].) Similarly, section 19-503 (a) of the Administrative Code of the City of New York gives the TLC authority to “promulgate such rules and regulations as are necessary to exercise the authority conferred upon it by the charter” and the Administrative Code.
In the instant matter, the TLC has stated that its purpose in enacting the new rules is to provide incentives for taxicab owners to buy cleaner vehicles, which is well within its broad powers as articulated in section 2300 of the New York City Charter. Under section 2303 (b) (1), the TLC has the power to regulate fares, and under section 2303 (b) (6), the TLC has the power to regulate standards of “safety, and design, comfort, convenience, noise and air pollution control and efficiency in the operation of vehicles.” Pursuant to this authority, the TLC is well within its mandate to establish regulations in the furtherance of these general objectives.
Petitioners assert that, whereas section 2303 of the New York City Charter creates a broad grant of authority for the TLC, the TLC may not disregard the clear mandate enunciated in section 2304 of the New York City Charter, which requires the TLC to consider the taxicab owners’ costs in establishing lease caps.[3] However, petitioners are misreading the wording of section 2304.
Section 2304 (c) of the New York City Charter states:
“In determining the rates of fare, the commission may consider all facts which in its judgment have a bearing on a proper determination, with due regard among other things to the . . . gross revenues derived from operation, to the net return derived from operation, to the expenses of operation including the income of drivers or operators, to the return upon capital actually expended” (emphasis added).
Contrary to petitioners’ assertions, the New York City Charter does not require that the TLC take into consideration the owners’ costs, but simply states that the TLC may consider those expenses, among other things, in making its rate determina *264 tions. Furthermore, petitioners have provided no statutory or judicial precedent to support their position that the TLC lacks the power to change its regulations in the manner in which such change was effectuated in the instant case. As a consequence, the court cannot hold that the TLC’s action nullifying its former position is without legislative authority.
However, even if the TLC could not, or should not, have changed TLC Rules § 1-78.1 (b), the court finds that petitioners’ argument that the TLC failed to consider their costs in making the discussed changes is unpersuasive.
It is undisputed that petitioners did not present any evidence of their costs and expenses at the public hearing on the rule changes. A general rule of judicial review of administrative action is that “the courts generally refuse to review a determination . . . based on evidence or arguments that were not presented during the proceedings before the lead agency.” (Matter of Miller v Kozakiewicz, 300 AD2d 399, 400 [2d Dept 2002].)
Petitioners maintain that evidence of their costs is publically available, and that the TLC should have made the effort to determine those costs from such public records. However, section 2304 (e) of the New York City Charter, the section relied upon by petitioners for their main argument regarding costs, explicitly states: “At any public hearing involving a change in the rates of fare, the burden of proof to show that existing rates are not reasonable shall be upon such segment of the business or industry affected by this chapter as is involved in the change in rates.”
Hence, the burden to provide financial information is on the fleet owners, not the TLC, when public hearings are held regarding fare rate changes, and, by judicial interpretation, changes in the standard lease cap.
Additionally, the information provided by the experts attached to the moving papers is not relevant to the instant inquiry with respect to petitioners’ costs. The materials referred to by the experts are national statistics, not the economic data relative to expenses in the City of New York. Geographical differences with respect to costs and expenses are important factors that must be taken into consideration if an agency is to base its determination on financial factors. (See Matter of Jewish Mem. Hosp. v Whalen, 47 NY2d 331 [1979].)
Furthermore,
“[although documented studies often provide sup *265 port for an agency’s rule making, such studies are not the sine qua non of a rational determination. As we have previously stated, in a rate-fixing decision, the commissioner, of course, is not confined to factual data alone but also may apply broader judgmental considerations based upon the expertise and experience of the agency he heads.” (Matter of Consolation Nursing Home v Commissioner of N.Y. State Dept. of Health, 85 NY2d 326, 332 [1995] [internal quotation marks omitted].)
Having determined that the TLC was acting within its authority and power to change its regulatory rules and rates for the standard lease cap, the court must also determine that such determination had some evidentiary foundation so as not to be arbitrary or capricious.
As indicated above, the agency held public hearings, and the record supports a finding that there is a sufficient factual basis upon which the TLC’s actions may be supported. Indeed, petitioners themselves do not argue that there is a lack of evidentiary support for the TLC’s actions, but contend that the TLC could not have made its determination without giving due regard to petitioners’ costs and expenses. Having disposed of that argument above, the court finds that the TLC’s rules with respect to the changes in the rates for standard lease caps were within its authority, and will not be annulled by this court.
Whereas the TLC was acting within its authority in changing the standard lease cap rates in the manner detailed in this decision, the court is aware that this particular action may have been preempted by federal statutes, a determination that will be made by the federal courts hearing that issue. This decision is limited to the TLC’s power to make such rulings, not whether those rulings conflict with federal laws.
Petitioners’ last challenge to the TLC’s actions concerns the position that the TLC has taken with respect to the collection of state taxes discussed above.
Under New York State law, taxi drivers who lease vehicles owe three types of taxes on those rentals: (1) state and local sales tax (Tax Law § 1101 [b] [5]; § 1105 [a]); (2) state “special tax on passenger car rentals” (Tax Law § 1160 [b]); and (3) a special supplemental tax (Tax Law § 1166-a). The only portion of the standard lease cap that is subject to these taxes is the portion representing the rental of the vehicle itself, which is set, by the agreement referenced above, at $24 per shift.
*266 The driver of the car, who is considered to be the consumer for tax purposes, is required to pay these taxes, and such tax burden cannot be shifted to another person, nor can the driver be otherwise relieved of this tax liability. (20 NYCRR 525.2 [a] [4]; Tax Law § 1133 [b].) The amount of these taxes due must be indicated separately on all receipts provided to the driver. (Tax Law § 1132 [a] [1].)
The fleet owner, as trustee for the State, is required to collect such taxes from the driver for remittance to the State. (Id.) Further, pursuant to the Tax Law, the wilful failure to collect such taxes may subject the fleet owner to criminal penalties (id.), and the fleet owner is prohibited from paying such taxes on behalf of the drivers. (20 NYCRR 532.1 [c].) In addition, if the fleet owner fails to collect these taxes from the drivers, the fleet owner itself is required to pay the taxes directly to the State. (20 NYCRR 532.1 [e].)
With respect to the TLC’s new tax rules, petitioners argue that they violate the Tax Law, in that the TLC’s new tax rules mandate that each itemized cost must reference the TLC rule authorizing such cost, and, therefore, the TLC is prohibiting the fleet owners from collecting the above-referenced taxes from the drivers, because such taxes are not authorized by the TLC Rules.
The court finds no conflict between the TLC tax rules and the Tax Law. The TLC Rules require itemization, as does the Tax Law. Petitioners’ only argument is that taxes are not authorized by the TLC Rules, and, as a consequence, the fleet owners would not be able to cite to a TLC rule in order to identify the taxes on the drivers’ receipts. However, as the TLC points out, petitioners may cite to TLC Rules § 1-60, which requires owners to comply with all other applicable laws, which would include the Tax Law, and TLC Rules § 1-78 (a) (4), which impliedly authorizes the imposition of taxes if the fleet owner rents the vehicle and medallion below the standard lease cap.[4]
The TLC has enunciated, as its rationale for these new tax rules, the need to standardize the differences among fleet owners in how taxes are charged to the drivers. According to testimony at the public hearing on these amendments, some fleet owners charged tax within the lease cap, whereas some *267 fleet owners charged taxes above the lease cap. (Respondents’ exhibit U.) Further, the TLC asserts that it requested MTBOT to provide its opinion on whether taxes should be included or excluded from the lease cap, but that petitioners declined to respond to this request. The TLC further states that its position has always been that “the lease cap is the lease.cap,” and that taxes and fees should not be charged to drivers over and above the cap. (Respondents’ exhibit X.)
Petitioners’ contention is that, because fleet owners, in the past, have been able to charge taxes above the lease cap, it is arbitrary and capricious for the TLC now to change its position, which has the effect of lowering petitioners’ profit on its leases, and, therefore, has a punitive effect.[5]
While the court agrees that the practical effect of including state taxes in the standard lease cap is to lower petitioners’ return, the court cannot state with any certainty that such rule is arbitrary, capricious, or contrary to law.
The court notes that neither side has provided any judicial support for its argument relative to these new tax rules. However, as stated above, as long as the agency can support its position with some demonstrable evidence, the court cannot overturn the agency’s rule-making decisions that constitute reasonable acts in furtherance of its regulatory scheme. (Matter of Independent Master Plumbers of Westchester County, Inc. v Westchester County Bd. of Plumbing Examiners, 13 AD3d 374 [2d Dept 2004].) This is so, even if the court might disagree with the agency’s action. (See Matter of Chemical Specialties Mfrs. Assn. v Jorling, 85 NY2d 382 [1995].) Therefore, based on the foregoing, the court cannot annul the TLC’s new tax rules as being arbitrary, capricious, or contrary to law.
Last, in motion sequence number 002, the TLC moves to dismiss the action because, among other things, petitioners have failed to file a summons, as required by CPLR 304, for that portion of the petition seeking a declaratory judgment and monetary relief. However, since there was no challenge to the portion of the petition seeking article 78 review, and, as indicated above, that review has resulted in the denial of the petition, respondents’ CPLR 3211 motion is rendered moot.
*268 Conclusion
Based on the foregoing, it hereby is ordered that respondents’ motion to dismiss that portion of the petition seeking a declaratory judgment is granted; and it is further declared that the TLC’s actions were not arbitrary, capricious or contrary to state or local law; and it further is ordered and adjudged that the petition is denied and the proceeding is dismissed.

. (Matter of Statharos v Tax Appeals Trib. of State of N.Y. 306 AD2d 650 [3d Dept 2003].) The papers submitted by petitioners indicate both this amount and an amount of $4.77 for this tax increase, so the above-stated amount, one of the numbers provided by petitioners, is used illustratively.

. Petitioners and respondents acknowledge that the mandatory useful life for a Crown Victoria is three years, meaning that within three years, assuming that all current taxicabs are Crown Victorias, which they are not, all of the vehicles in current use could be replaced by fuel-efficient taxis.

. The TLC’s ability to set standard lease caps under its general rate and fare authority was established in Ann Service Leasing Corp. v McGrath-McKechnie (Sup Ct, NY County, June 30, 1999, index. No. 107422/98) and is not challenged in this petition.

. TLC Rules § 1-78 (a) (4) states, in pertinent part: “No owner . . . may charge . . . any payment of any kind, such as a tax, . . . other than a lease amount no greater than the applicable Standard Lease Caps.”

. The TLC claims that petitioners failed to raise the tax issue at the hearing, and therefore are precluded from asserting it now. Petitioners state that they did bring up the issue of the new tax rules at the hearing, but did not specifically use the words that they are using in the petition to challenge the action. The court believes that the issue was sufficiently raised, if inappropriately articulated, at the hearing to warrant discussion in this decision.