OPINION OF THE COURT
Levine, J.
In response to a report by the New York Department of Health recommending that the Department of Environmental *387 Conservation (DEC) promulgate a regulation limiting the concentration of a pesticide called DEBT (N,N-diethyl-m-toluamide) in products sold in New York, DEC notified DEBT product registrants of a proposed rule that would amend the existing list of restricted use pesticides contained in 6 NYCRR 326.2 (b). The proposed rule would have added DEBT in concentrations greater than 30% to the list. At that time, DEC issued a SEQRA notice in the form of a Determination of Non-Significanoe regarding the proposed rule making. DEC then published a Notice of Proposed Rule Making which contained a regulatory impact statement, and the rationale for the proposed rule. DEC notified parties holding registrations for high concentration DEBT products about the proposed rule and of a legislative public hearing that would be held to accept public comment on the proposed rule. The hearing was held on July 23, 1991, and numerous oral and written comments were submitted, including submissions by petitioners Chemical Specialties Manufactures Association. After the hearing, DEC solicited information from all high concentration DEBT registrants regarding any potential impact the proposed rule would have on their businesses. DEC also accepted comments from other agencies, other manufacturers, and the public during the public comment period.
After publishing reports summarizing the legislative hearing and public comments, responding to the public comments, and issuing a revised negative SEQRA declaration, DEC issued a Notice of Adoption of the proposed rule. The DEBT regulation, as adopted, prohibits use, sale or distribution of pesticide products which contain in excess of 30% DEBT, or 33% DEBT for controlled release formulas (6 NYCRR 326.2 [b] [10]). Products containing 30% or less DEBT concentration (or less than 33.33% in controlled release formulas) continue to be classified for general use (id.; see also, ECL 33-0101 [19]). After publishing the rule, DEC advised registrants of high concentration DEBT products that their products would no longer comply with the DEBT regulation and that the product registrations would be canceled as of the effective date of the regulation.
Upon receipt of the notice of cancellation, the affected registrants requested that DEC refer the cancellation decision to an independent advisory committee, as is required under title 7 of ECL article 33. DEC denied the request.
*388 Petitioners, a trade organization of chemical manufacturers, DEBT product registrants, and a user of high concentration DEBT products, commenced this action seeking declaratory and injunctive relief. Petitioners challenge the validity of the DEBT regulation on the grounds that (1) respondents lacked statutory authorization to ban pesticide products by rule making; (2) respondents lacked statutory authority to effect cancellation of pesticide registrations by the DEBT rule; (3) adoption of the DEBT rule was arbitrary and capricious; (4) adoption of the DEBT rule violated the State Environmental Quality Review Act (ECL art 8) (SEQRA); and (5) the DEBT rule violates the Commerce Clause of the United States Constitution.
Supreme Court invalidated the rule on the ground that respondents exceeded their rule-making authority. The Appellate Division modified, holding that the rule was valid but that the rule does not and cannot automatically cancel the existing pesticide registrations (197 AD2d 314). The Appellate Division further held, however, that in any such proceeding to cancel the registration of high DEBT concentration pesticide products, "[t]he registrant cannot challenge the validity of the DEBT regulation” (id., at 320).
Petitioners appealed as of right to this Court on constitutional grounds. We now affirm the order of the Appellate Division.
I.
ECL article 33 contains separate and independent mechanisms by which pesticide use, sale, and distribution are regulated throughout the State. At issue in this case are title 3, containing the general rule-making power of the Commissioner, and title 7, the individual adjudicatory rights of pesticide product registrants.
Title 3 of ECL article 33 vests the Commissioner with exclusive jurisdiction over "all matters pertaining to the distribution, sale, use and transportation of pesticides” (ECL 33-0303 [1]). Specifically, it authorizes the Commissioner "[t]o promulgate a list of restricted use pesticides and the usages of such pesticides that may be permitted subject to whatever conditions or limitations which the [Commissioner deems appropriate to fully protect the public interest” (ECL 33-0303 [3] [d]). A "restricted use pesticide” is defined as one "[w]hich the [Cjommissioner finds is so hazardous to man or other *389 forms of life that restrictions on its sale, purchase, use, or possession are in the public interest” (ECL 33-0101 [42] [b]). Additionally, the Commissioner is authorized to "adopt, promulgate and issue such rules and regulations as he [or she] may deem necessary to carry out and give full force and effect to the provisions of this article” (ECL 33-0303 [3] [e]).
Title 7 of article 33 governs registration of "[e]very pesticide which is used, distributed, sold, or offered for sale within this state or delivered for transportation or transported in intrastate commerce or between points within this state through any point outside this state” (ECL 33-0701). Registration is a prerequisite to a pesticide product’s use, distribution, or sale in this State (id.). The Commissioner is required to register a pesticide if "the composition of the pesticide is such as to warrant the proposed claims for it, and if the pesticide and its labeling and other material * * * comply with the requirements of [the] article” (ECL 33-0709). An individual’s registration of a pesticide may be canceled "whenever it does not appear that the article or its labeling or other material * * * complies with the provisions of this article” (ECL 33-0713 [1]). However, "[wjhenever the [C]ommissioner determines that registration of a pesticide should be canceled” (ECL 33-0713), the registrant is entitled to certain procedural rights including notice (ECL 33-0713 [2]), time to make necessary corrections (ECL 33-0713 [3]); referral to an advisory committee (ECL 33-0715); and an adjudicatory public hearing (ECL 33-0717).
II.
 Petitioners’ main contentions on this appeal are that DEC lacks statutory authority to ban pesticide products by rule making, and, alternatively, that title 3 of ECL article 33 should not be read as authorizing a rule which would preclude current registrants of high concentration DEBT products from challenging the underlying scientific bases for the DEBT rule in their statutorily required adjudicatory cancellation of registration proceedings. We disagree with both assertions.
First, title 3 of ECL article 33, and particularly sections 33-0303 (3) (d) and (e), contain broad legislative delegations to the Commissioner to act against dangerous pesticides, even to ban them outright, by means of legislative rule making. Specifically, title 3 was enacted in 1970 as part of chapter 732 (L 1970, ch 732) which (1) defined a restricted use pesticide *390 (ECL 33-0101 [42] [b] [Agriculture and Markets Law former § 148 (22) (B)]); (2) gave the Commissioner authority to "promulgate a list of restricted use pesticides and the usages of such pesticides that may be permitted subject to whatever conditions or limitations which the [C]ommissioner deems appropriate to fully protect the public interest” (ECL 33-0303 [3] [d] [Agriculture and Markets Law former § 150 (1) (4)]); and (3) created a permit system as the exclusive means of selling, using or possessing restricted use pesticides (ECL 33-0901 [Agriculture and Markets Law former § 149]).
Supporting the express language of chapter 732, the legislative history clearly indicates an intent to authorize a complete ban on the use of dangerous pesticides under certain circumstances. The Executive Memorandum in support of chapter 732 states that the "Commissioner may refuse to issue * * * a permit [for the sale, purchase, possession or use of a restricted use pesticide] for a number of reasons, including * * * failure to comply with the law or rules and regulations, and inadequate knowledge or experience concerning the use and application” thereof (Mem of State Executive Dept, 1970 McKinney’s Session Laws of NY, at 2987). And in the Governor’s Message of Approval of chapter 732, he stated that a permit to sell or use a restricted use pesticide "must [be] re/wse[d] * * * for use of a particular pesticide if there is a reasonable, less dangerous alternative available, capable of performing the task required” (1970 NY Legis Ann, at 513 [emphasis in original]).
Thus, both the express statutory language and the legislative history of chapter 732 of the Laws of 1970 contradict the petitioners’ suggestion, adopted by the dissent, that title 3 of ECL article 33 was intended merely to "improve the Commissioner’s ability to control misuse of registered pesticides by sellers, distributors, farmers, and other applicators.” (Dissenting opn, at 402.)
We are similarly unpersuaded by petitioner’s alternative argument, adopted by the dissent, construing ECL article 33 to prevent the exercise of the Commissioner’s rule-making power in a way that would resolve factual issues that would otherwise be litigated in an adjudicatory registration cancellation hearing under title 7, e.g., whether high concentrations of DEBT are unsafe.
Under settled principles of administrative law, a regulation adopted in a legislative rule-making proceeding can in *391 deed foreclose litigation of issues in later statutorily required individual adjudicatory proceedings. Thus, as stated by a leading authority on administrative law:
"A legislative rule can have the effect of eliminating what otherwise would be a party’s right to a hearing to resolve contested issues of fact. A rule can have this effect by redefining the nature of a substantive right in a manner that makes the right no longer contingent on resolution of those factual issues. Indeed, this may be the single most important effect of legislative rules. Many agencies employ them routinely to serve this purpose.” (1 Davis and Pierce, Administrative Law § 6.5, at 250 [3d ed].)
Thus, precisely opposite to the position urged by petitioners, the general administrative law principle is that a regulation adopted in a legislative rule-making proceeding, such as the DEBT rule, can apply to foreclose litigation of issues in any individual adjudicatory proceeding provided for under the enabling legislation. The Supreme Court reaffirmed this doctrine in Mobil Oil Exploration v United Distrib. (498 US 211, 228):
"Time and again, '[t]he Court has recognized that even where an agency’s enabling statute expressly requires it to hold a hearing, the agency may rely on its rulemaking authority to determine issues that do not require case-by-case consideration.’ Heckler v. Campbell, [461 US 458, 467]; Permian Basin, [390 US 747, 774-777]; FPC v. Texaco Inc., 377 U. S. 33, 41-44 (1964); United States v. Storer Broadcasting Co., 351 U. S. 192, 205 (1956). The Commission’s approval conditions establish, and its findings confirm, that the abandonment at issue here is precisely the type of issue in which '[a] contrary holding would require the agency continually to relitigate issues that may be established fairly and efficiently in a single rulemaking proceeding.’ Heckler v. Campbell, supra, at 467.”
That petitioners have a cognizable economic interest in their pesticide product registrations does not change this result. A registration is for administrative law purposes nothing more than a license or "similar form of permission required by law” (State Administrative Procedure Act § 102 [4]), *392 in this case, permission to sell or otherwise distribute a pesticide product. The case law is absolutely clear that statutory rights to a full adjudicatory hearing before denial or withdrawal of all such forms of permission may be trumped by the exercise of agency rule-making authority (see, Weinberger v Hynson, Westcott & Dunning, 412 US 609 [as to statutory adjudicatory hearing required before agency withdrawal of approval of new drug marketing application]; Federal Power Commn. v Texaco, 377 US 33 [as to adjudicatory hearing required before denial of a certificate of public convenience and necessity to sell natural gas]; United States v Storer Broadcasting Co., 351 US 192 [as to adjudicatory hearing required before denial of a broadcasting license]; Air Line Pilots Assn, v Quesada, 276 F2d 892 [2d Cir] [as to adjudicatory hearing required before cancellation of a commercial airline pilot’s license]). New York decisional law is completely consistent with these authorities (see, Matter of Kupferman v New York State Bd. of Social Welfare, 60 AD2d 674, affd on opn below 47 NY2d 738; Matter of Parochial Bus Sys. v Parker, 40 AD2d 1062, appeal dismissed 32 NY2d 901 [citing Air Line Pilots Assn. v Quesada, supra]).
Moreover, none of the enabling statutes at issue in these cases contained an express delegation of authority to make rules that settle factual issues that otherwise would be litigated in an adjudicatory hearing. Rather each contained a broad grant of rule-making authority with a fact-finding component. Similarly, article 33 gives the Commissioner authority to promulgate a list of restricted use pesticides (ECL 33-0303 [3] [d]) which are, by definition, "pesticide[s] * * * [w]hich the Commissioner finds [are] so hazardous to man or other forms of life that restrictions on [their] sale, purchase, use, or possession are in the public interest” (ECL 33-0101 [42] [b] [emphasis added]). Thus the legislatively authorized power to declare a pesticide restricted is necessarily a fact-finding power vested in the Commissioner, which is in this way no different from the rule-making powers at issue in the above-cited cases.
Nor does the legislative history to the various provisions of article 33 compel a deviation from the basic rule that a broad grant of rule-making power standing side-by-side with individual adjudicatory rights in an enabling statute — each with its own distinctive role — includes the power to resolve by rule making a question of fact that would otherwise be at issue in an adjudicatory proceeding. Petitioners argue that because *393 ECL article 33 was intended to conform with the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) (7 USC §§ 136-136y), and under FIFRA the Administrator may not decide by rule issues of safety and effectiveness of a pesticide, the Commissioner may not make such determinations under article 33. We find this argument unpersuasive.
To begin with, FIFRA contains no statutory counterpart to the specific rule-making power to restrict or limit pesticide use under ECL 33-0303 (3) (d) and title 9 of ECL article 33, without any kind of adjudicatory hearing. In this very significant respect, the ECL has no "parallel” in FIFRA (dissenting opn, at 406). Also, in contrast to the New York statutory scheme, the Environmental Protection Agency’s (EPA) authority under FIFRA to designate a pesticide product as a restricted use pesticide is exclusively limited to classifying restricted use for registration purposes (7 USC § 136a [d] [1] [A]), and under FIFRA a change in classification to restricted use with respect to a previously registered pesticide gives rise to all of the same adjudicatory remedies as does a cancellation of registration (7 USC § 136a [d] [2]). There are no comparable provisions in the New York statutory scheme.
Moreover, all of the legislative history of ECL article 33 pointing to its conformity with FIFRA emanates from enactment of the predecessor version of title 7 of article 33 in 1965, a year after FIFRA was amended in substantially its present form (L 1965, ch 228, amending Agriculture and Markets Law former § 149-a). On the other hand, the provisions of title 3 of article 33 upon which DEC relies for rule-making authority to ban the use of pesticides containing more than 30% DEBT were added five years later in 1970 (L 1970, ch 732, amending Agriculture and Markets Law former art 11). That history is indicative that the Legislature intended to create an independent, new, swift and decisive means to restrict and in some instances prohibit the uses of dangerous pesticides. Thus, the Assembly Sponsor stated, "[p]assage of this bill presents the quickest legal way for the future to place persistent pesticides under complete control” (Letter from Member of Assembly Hardt, Bill Jacket, L 1970, ch 732, at 1). The most pertinent legislative history of the enabling statute here, therefore, not only fails to support petitioners’ interpretation, it actually contradicts it.
The dissenters appear to have a different interpretive theory upon which to base their argument that the Commission *394 er’s rule-making power under title 3 does not extend to foreclose any factual issues in a registration cancellation adjudicatory hearing, allowing relitigation — and possibly inconsistent results — of rule-making determinations with registrants’ individual proceedings. Essentially pointing to language in and legislative history of title 7 regarding its conformity to FIFRA, the dissent argues that the omission in title 3 of the FIFRA procedural rights of a registrant before its product can be designated a restricted use pesticide was an unintended legislative oversight (dissenting opn, at 406) which this Court can remedy by implying the FIFRA advisory committee and adjudicatory procedures through statutory interpretation. This theory is flawed in several respects. First, it anomalously applies the legislative history of the 1965 title 7 State pesticide registration statute to interpret a statutory agency rule-making authority to ban dangerous pesticides enacted five years later. It also violates any number of canons of statutory construction. "[N]cw language cannot be imported into a statute to give it a meaning not otherwise found therein” (McKinney’s Cons Laws of NY, Book 1, Statutes § 94, at 190). Moreover, "a court cannot amend a statute by inserting words that are not there, nor will a court read into a statute a provision which the Legislature did not see fit to enact” (id., § 363, at 525). Also, an "inference must be drawn that what is omitted or not included was intended to be omitted and excluded” (id., § 240, at 412).[1]
In sum, title 3 confers broad rule-making authority on the Commissioner. Acting pursuant to this authority, the Commissioner has promulgated a rule of general applicability which bans DEBT in high concentrations. The Commissioner has not, however, canceled the registrations of high concentration DEBT products. To do so, we all agree, he must act pursuant to title 7 cancellation of registrations procedures. In title 7 proceedings petitioners can raise issues, including scientific issues, particularly affecting them, but cannot relitigate the underlying issue already determined by the Commissioner exercising his rule-making authority.
*395 This result gives full effect to title 3 and title 7, and flows naturally from a reading of article 33 in its entirety. It does not eviscerate, modify, bypass, override or repeal (expressly or impliedly) title 7. Rather title 7 remains the only means by which the Commissioner may cancel an existing registration. In those proceedings, petitioners may challenge whether their product "or its labeling or other material required to be submitted complies with [article 33]” (ECL 33-0713 [1]) through an adjudicatory hearing, by seeking the opinion of an advisory committee, or both. Thus cancellation need not be automatic, and undoubtedly individual issues may sometimes be scientific. Registrants may not, however, challenge and relitigate the rules that have been validly promulgated pursuant to a separate provision of article 33. They are bound by those rules — just as other registrants, the agency itself and the general public are bound by those rules.
Thus we adhere to the holding of the Appellate Division, that the registrations of high DEBT concentration products must be canceled through the title 7 process, but that in such proceedings the scientific validity of the DEBT rule may not be challenged because that holding is completely consistent with doctrine, precedent and the enabling statute.
III.
Two of petitioners’ remaining objections to the DEBT rule, i.e., that it is irrational and arbitrary and capricious and in violation of SEQRA (ECL art 8), are refuted by the same detailed factual submissions by the Commissioner contained in the record. Therefore, we shall address them together.
DEC’s background documents and assessment of public comments detail 44 scientific studies and empirical data that indicate that use of high concentration DEBT products may cause adverse health effects. In addition, the affidavit of Nancy Kim, PhD, the State Department of Health Director of the Division of Environmental Health Assessment, fully explains and documents the ample support for the conclusion that DEBT in concentrations above 30% is dangerous to health, particularly to that of children. Specifically, the conclusion that high concentration DEBT products are dangerous to children is supported by a World Health Organization technical report prepared by an expert committee on vector biology, an EPA published book (Morgan, Recognition and *396 Management of Pesticide Poisoning [4th ed]),[2] a United States Department of Defense study, a professor at Harvard School of Public Health, the medical directors of various poison control centers, and health officials from New Jersey, Connecticut, Massachusetts and Maine. Moreover, as Dr. Kim pointed out, petitioners, although invited to do so, provided no credible evidence to support their claims that a higher concentration of DEBT would significantly increase its effectiveness as a deer tick repellant.
The affidavits of Dr. Kim and Dr. Dennis White, Director of the Arthropod-borne Disease Program and Director of the Tick-Borne Disease Institute for the State of New York, as well as the report by the Bureau of Toxic Substances Assessment of the New York State Department of Health, establish that the agency evaluated the dangers to health of higher concentrations of DEBT, the evidence that the mosquito-repellant effectiveness of DEBT in higher concentrations than 30% was not significantly enhanced, the evidence that low concentrations of DEBT are 90% effective against ticks when used on clothing, and the lack of hard evidence one way or the other regarding DEET’s effectiveness against deer ticks when used on human skin in high concentrations.
This Court’s role in reviewing an agency action is not to determine if the agency action was correct or to substitute its judgment for that of the agency, but rather to determine if the action taken by the agency was reasonable (see, Matter of Pell v Board of Educ., 34 NY2d 222, 230-235; New York State Assn. of Counties v Axelrod, 78 NY2d 158, 166). Thus, the foregoing demonstrates that the record here contains sufficient evidence to provide a rational basis for the Commissioner’s conclusion that possible detrimental side effects from the human use of high concentration DEBT products outweigh possible benefits from their use. The Commissioner, therefore, did not act arbitrarily and capriciously in promulgating the DEBT rule.
Moreover, petitioners’ claim that DEC violated SEQRA by issuing a Determination of Non-Significance with regard to the environmental impact of the DEBT rule also fails. It is well settled that "[i]n reviewing * * * SEQRA determinations *397 * * * we are limited to considering 'whether a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion’ ” (Chinese Staff & Workers Assn. v City of New York, 68 NY2d 359, 363 [quoting CPLR 7803 (3)]). Thus, we may not question the "desirability of any action or choose among alternatives, but [we must] assure that the agency itself has satisfied SEQRA, procedurally and substantively” (Matter of Jackson v New York Urban Dev. Corp., 67 NY2d 400, 416). The relevant question before us, then, is whether the respondents "identified the relevant areas of environmental concern, took a 'hard look’ at them, and made a 'reasoned elaboration’ of the basis for their determination” (Chinese Staff & Workers Assn. v City of New York, supra, at 363-364). And although the requirement to produce an environmental impact statement is triggered by a relatively low threshold — if the action may have a significant effect on the environment (see, id., at 364-365) — "[a] conditional negative declaration is properly issued when the agencies have made a thorough investigation of the problems involved and reasonably exercised their discretion” (id., at 364; see also, Matter of United Petroleum Assn. v Williams, 102 AD2d 491, affd 65 NY2d 708).
The record here, particularly the Kim and White affidavits and documents referred to therein as previously discussed, amply demonstrates that DEC identified the relevant area of environmental concern (the alleged possibility that the DEBT rule could enhance the incidence of vector-borne Lyme Disease), and took a hard look at all the evidence available on the issue. Having taken this hard look, DEC could reasonably conclude that the DEBT rule would not cause any significant environmental impact. That DEC considered the concern raised by petitioner’s submissions is evidenced by the DEC’s revised negative declaration, made after the legislative rule-making public hearing, which gave a reasoned elaboration of its determination that the DEBT rule would have no significant impact on the environment. Thus, DEC established full compliance with statutory and court-imposed SEQRA requirements (see, Matter of Jackson v New York Urban Dev. Corp., 67 NY2d 400, 417, supra).
Thus we also reject the dissent’s SEQRA argument. In accusing DEC of failing to comply with SEQRA, the dissent appears to place the burden on DEC to demonstrate factually that higher concentrations of DEBT would not be more effective against the spread of Lyme Disease. However, such a *398 burden has never been imposed by SEQRA. DEC was not required to accept as true the assertions by chemical industry retained experts — which were unsupported by any responsible scientific study — that the DEBT rule could have an impact on the incidence of Lyme Disease. Moreover, the dissent fails to identify any empirical scientific data submitted by petitioners which DEC overlooked in its SEQRA determination.
IV.
Finally, there is no merit to petitioners’ Commerce Clause argument. First, FIFRA (7 USC § 136v) delegates to States the authority to regulate the sale and use of pesticides. "Where state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with interstate commerce” (White v Massachusetts Council of Constr. Empls., 460 US 204, 213; see also, Southern Pac. Co. v Arizona, 325 US 761, 769). Moreover, States may act to regulate matters of legitimate local concern even though such regulation affects interstate commerce (Maine v Taylor, 477 US 131, 138). The regulation at issue here was enacted in the interest of public health and safety— obviously legitimate local concerns — and, concededly does not discriminate between in-State and out-of-State manufacturers and distributors. Petitioners have made no showing that "the burden imposed on commerce is clearly excessive in relation to the putative local benefits” (Pike v Bruce Church, 397 US 137, 142), and their bare allegation that the DEBT rule imposed an undue burden on interstate commerce is insufficient to render the rule unconstitutional (see, Pharmaceutical Mfrs. Assn. v Whalen, 54 NY2d 486, 495). The constitutionality of the rule should, therefore, be sustained.
Accordingly, the order of the Appellate Division should be affirmed, with costs.

. Further demonstrating that title 3 was not intended to be inextricably linked to FIFRA is the legislative history which indicates that chapter 732 was particularly targeted against DDT, the Legislature clearly intending to impose severe restrictions on its sale and usage. Contrastingly, the EPA considered itself bound under FIFRA to move against DDT-based pesticides only through the slower, more cumbersome adjudicatory procedures of FIFRA for cancellation of their registrations (see, 37 Fed Reg 13,369-13,374 [July 7,1972]).

. Specifically, the EPA book warns, "Great caution should be exercised in using DEBT on children. Only the products containing the lower concentrations (usually 15%) should be used, and application should be limited to exposed areas of skin, using as little repellent as possible.”