# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 47
The People &c.,
   Appellant,
    v.
Limmia Page,
   Respondent.

Daniel J. Punch, for appellant.
Robert L. Kemp, for respondent.

FEINMAN, J.:

Using the emergency lights on his unmarked Chevrolet Tahoe, a federal marine interdiction agent with the United States Customs and Border Protection (CBP) stopped

the driver of a vehicle in which defendant was a passenger for driving dangerously on a public highway in Erie County. After pulling the driver over, the agent waited in his truck for members of the Buffalo Police Department who, upon arriving at the scene, searched the vehicle and arrested defendant for criminal possession of a weapon. The question on this appeal is whether the courts below properly relied on our decision in People v Williams (4 NY3d 535 [2005]) in granting defendant's motion to suppress the evidence recovered. Because we conclude that Williams is inapposite, we reverse.

I.

One June evening in 2017, the on-duty agent had just concluded a "maritime patrol" and was merging his unmarked Tahoe onto Interstate 190 in Erie County on his way to make security checks at the local marinas. The Tahoe was equipped with an emergency radio as well as "red and blue emergency lights in the grille of the front of the truck" and "a little light bar inside the windshield," but did not carry the full complement of lights and sirens typically found on a police vehicle. As the agent was merging, he suddenly noticed a pair of headlights, which belonged to a vehicle occupied by defendant and two others, "coming up from behind in the rearview mirror." The driver of the vehicle rapidly closed in behind the agent, then suddenly hit the brakes to avoid rear-ending the Tahoe. Although the driver pulled back, he started weaving between the right and left lanes and then passed the agent's Tahoe on the left, leading to a second near-collision with another car that was merging from Route 198 onto Interstate 190.

The vehicle continued to drive erratically, leading to a third near-collision, and the agent followed. After attempting to contact the State Police on the radio equipped in his Tahoe, the agent dialed 911 on his personal phone to report the incident. As he and defendant's vehicle exited the freeway, the agent became increasingly concerned for public safety and "energized" the lights on his Tahoe, prompting the driver to pull over. After relaying their location to the 911 operator, the agent sat in his parked Tahoe and waited roughly five minutes for the police to arrive.

An officer of the Buffalo Police Department arrived and spoke to the agent before approaching defendant's vehicle. As a safety measure, the agent accompanied the lone officer to defendant's car and saw him speaking with the occupants, but he did not speak with defendant or anyone else in the vehicle directly. The agent left the scene when additional Buffalo police officers arrived and told him he was no longer needed. The agent never made any further statements to the Buffalo Police Department regarding recommended charges that should be filed, nor did he issue any traffic tickets in conjunction with his stop. After the agent's departure, the police searched the vehicle and recovered a gun. All three occupants were arrested and defendant was charged with criminal possession of a weapon in the second degree.

Before trial, defendant moved to suppress the gun as stemming from an unlawful seizure. Defendant argued both that the agent was not vested with peace officer powers pursuant to CPL 140.25 and, relying on our decision in Williams, that the stop was not a valid citizen's arrest because the agent used his emergency lights to effectuate the stop.

Supreme Court granted defendant's motion. The court concluded first that as a "federal agent employed by Customs and Border Protection," the agent and other "immigration and naturalization special agents" pursuant to CPL 2.15 had "the powers of a peace officer" within the meaning of CPL 140.25 to make a warrantless arrest. However, because "[a]t the time of the stop [the agent] was not acting pursuant to his special duties" (see CPL 140.25 [1] [a]), the court reasoned that the stop was not sustainable pursuant to that statute. "The question then becomes," Supreme Court explained, whether "this stop [is] considered a citizen's arrest pursuant to CPL 140.30." The court concluded that suppression was warranted under Williams because, by activating his emergency lights to pull the driver of the vehicle over and approaching the car with the Buffalo police officer, the agent "acted under the color of law with all the accouterments of official authority and could not effect a citizen's arrest."

Upon the People's appeal, the Appellate Division unanimously affirmed (166 AD3d 1472 [4th Dept 2018]). A Judge of this Court granted the People's application seeking leave to appeal (33 NY3d 979 [2019]).

II.

Despite crediting the agent's testimony that he observed the vehicle driving dangerously, which typically suffices to justify an "arrest by any person" (see CPL 140.30 [1]), Supreme Court nevertheless analogized this case to our decision in Williams and held that based on the methods the agent used to pull the vehicle over, the stop was not a valid citizen's arrest. The Appellate Division employed similar reasoning, relying solely on

Williams as the basis for suppression despite finding that defendant's vehicle was "engaging in dangerous maneuvers and allegedly committing several violations of the Vehicle and Traffic Law" (166 AD3d at 1472). Therefore, we are presented only with the legal question of whether the courts below correctly applied Williams.[1]

In Williams, two officers of the Buffalo Municipal Housing Authority were on patrol in one of that city's housing projects when they saw the defendant allegedly driving without a seatbelt down a street outside the officers' geographical jurisdiction (4 NY3d at 537). Significantly, "[u]niformed housing guards of the Buffalo municipal housing authority" are expressly included in the CPL as "persons designated as peace officers" (CPL 2.10 [17]). The officers stopped the defendant, ordered him to step out of his vehicle, and began questioning him. When "defendant replied in a manner that led the officer to suspect that defendant had an object in his mouth," the officers asked him to open it, revealing a plastic bag of crack cocaine (id.). The defendant shoved one of the officers and fled but was quickly apprehended by them and indicted for criminal possession of a controlled substance (id.). Before trial, the defendant moved to dismiss the charges, which motion Supreme Court granted, and the Appellate Division affirmed (see id. at 537-538).

---

[1] The dissent claims we are instead concluding that "a law enforcement official who is not a police officer or peace officer may impersonate one in order to conduct an arrest" as part of our supposedly broader effort to "justify a questionable stop" (dissenting op at 1-2, 9). However, as the dissent itself notes, the parties do not dispute whether the agent's actions here even meet the criteria of a full arrest, as opposed to a "stop or other lesser detention" (dissenting op at 2). Nor does defendant raise any claims that the agent's conduct violated his state or federal constitutional rights. In this regard, we address only whether Williams governed defendant's suppression motion.

On appeal, we affirmed. The People "concede[d] that the alleged traffic infractions and the seizure of defendant occurred outside the geographical jurisdiction of the Buffalo Municipal Housing Authority peace officers" but argued that the stop and warrantless arrest nevertheless "was the equivalent of a citizen's arrest" under CPL 140.30. In rejecting that claim, we explained that the CPL clearly distinguishes between the warrantless arrest powers of peace officers and private citizens, and that "there are also functional differences" which limit the places and circumstances under which peace officers can use their police powers (id. at 538; compare CPL 140.25 and 140.27 with 140.30, 140.35 and 140.40). Thus, "[t]o accept the People's argument and treat a peace officer as an ordinary citizen would render these purposefully drawn differences—and the plain language chosen by the Legislature—meaningless" (id.). In holding that the officers' law enforcement actions did not constitute a valid citizen's arrest under CPL 140.30, we clarified that "[t]his, of course, is not to say that an individual employed as a peace officer may never under any circumstances effect a citizen's arrest" (id. at 539 [emphasis added]). Rather, we concluded "only that a peace officer who acts under color of law and with all the accouterments of official authority cannot" (id. [emphasis added]).

Thus, because the warrantless arrest powers of peace officers are so clearly delineated in the CPL, our holding in Williams was based not only on the housing authority officers' specific conduct in enforcing a traffic infraction outside of their geographical jurisdiction,[2] but also on the conclusion that the entire statutory scheme would be frustrated

---

[2] We note that these geographical limitations do not apply to a felony committed in the officer's presence (CPL 140.25 [4]).

if they could, *as peace officers*, conveniently avail themselves of the citizen's arrest statute in lieu of their already-tailored arrest powers (id.).[3] Although the Appellate Division in this case declined to address this issue directly (see 166 AD3d at 1473-1474 ["Even assuming, arguendo, that the agent . . . is not a peace officer and does not possess the powers thereof . . . the court properly determined that the agent did not effect a valid citizen's arrest"] [emphasis added]), we conclude that whether the federal marine interdiction agent in this case is a peace officer is ultimately critical to determining whether Williams applies under the circumstances.

---

[3] Relying heavily on the titles of the relevant provisions rather than their substantive text, the dissent argues that Williams turns merely on "whether the individual conducting the stop or arrest conveys the appearance of 'acting . . . as a police officer or a peace officer'" (dissenting op at 6-7). Of course, "the text of the statute must take precedent over its title," for "[w]hile a title or heading may help clarify or point the meaning of an imprecise or dubious provision, it may not alter or limit the effect of unambiguous language in the body of the statute itself" (Squadrito v Griebsch, 1 NY2d 471, 475 [1956]). In cherry-picking one word ("acting") from the titles of just two of these provisions (CPL 140.35, 140.40), the dissent misconstrues the scope of our holding in Williams, which only noted the distinctions in the statutory headings to broadly conclude that "[t]he Criminal Procedure Law differentiates between the respective powers of arrest possessed by peace officers and private citizens" (4 NY3d at 538 [citations omitted]).

Furthermore, our analysis in Williams was framed by the People's argument that the arresting officers could invoke CPL 140.30 to circumvent their limited arrest powers under CPL 140.25, which the People conceded did not apply because "the seizure of defendant occurred outside the[ir] geographical jurisdiction" (see id.). We held that the arresting officers could not invoke section 140.30, because to "treat a peace officer as an ordinary citizen" under the circumstances would render the distinctions drawn by the substantive text of the statutory scheme "meaningless" (id. at 539 [emphasis added]). In other words, before determining whether the arresting officers were "acting" as peace officers outside their limited jurisdiction, it was necessary to determine first whether they were, in fact, peace officers.

Whether the agent in this case is a peace officer depends, of course, on whether the CPL defines him as such. "Normally, the designation of 'peace officer' is given to a narrowly defined group of individuals who are not necessarily working in general law enforcement but who, when working pursuant to their 'special duties' or 'geographical area of employment,' have a need for limited police powers" (William C. Donnino, Practice Commentaries, McKinney's Cons Laws of NY, CPL 140.25). Because these arrest powers are conferred on those whose job is not policing *per se*, the definition of "peace officer" is carefully circumscribed in the CPL: although CPL 2.10 lists roughly 85 different positions that constitute a peace officer, the statute is clear that "<u>only</u> the following persons [listed under the statute] shall have the powers of, and shall be peace officers" (emphasis added).

Unlike the "[u]niformed housing guards of the Buffalo municipal housing authority" from <u>Williams</u>, federal agents are not expressly included in the CPL 2.10's exclusive list of "persons designated as peace officers." Yet under CPL 2.15, certain "federal law enforcement officers" are accorded limited peace officer powers (<u>see</u> CPL 140.25). We must therefore determine whether CPL 2.15 contemplates marine interdiction agents as "federal law enforcement officers."

On its face, CPL 2.15 does not include "marine interdiction agents" as among the "federal law enforcement officers" awarded certain peace officer powers under CPL 140.25. The statute does, however, include "United States Customs and Border Protection Officers and United States Customs and Border Protection Border Patrol agents" (CPL 2.15 [7]). Testifying for the People at the underlying suppression hearing, the agent in this

case explained that there are three entities that fall under the umbrella of CBP: border patrol, air and marine operations, and the office of field operations. As a member of air and marine operations, the agent claimed that he "ha[s] both authorities of border patrol and office of field operation[s] but [was] not in the verbiage of the New York State Peace Authority." Defendant nevertheless argues that, because the agent is generally employed by CBP, his position falls within CPL 2.15 (7).

We reject defendant's overly expansive interpretation of the statute. "As the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself" (People v Golo, 26 NY3d 358, 361 [2016], quoting Majewski v Broadalbin-Perth Cent. School Dist., 91 NY3d 577, 583 [1998]). In general, CPL 2.10 and 2.15 are exclusive lists, describing with relative precision the positions which meet the statutory definition of "peace officer" and "federal law enforcement officer," respectively. Subsection (7) of CPL 2.15 itself includes only two positions: CBP "Officers" and "Border Patrol agents." Meanwhile, other subsections of the statute either broadly describe an agency's membership (see, e.g., CPL 2.15 [10] ["United States probation officers"]), or are careful to specify which members within an agency are included (see, e.g., CPL 2.15 [14] ["Internal Revenue Service special agents and inspectors"] [emphasis added]). We have consistently interpreted statutes such as these under the maxim *expressio unius est exclusio alterius* such that "where a law expressly describes a particular act, thing or person to which it shall apply, an irrefutable inference must be drawn that what is omitted or not included was intended to be omitted or excluded"

(McKinney's Cons Laws of NY, Book 1, Statutes § 240; see Town of Aurora v Village of E. Aurora, 32 NY3d 366, 372-373 [2018]). Here, if subsection (7) were intended to refer to *all* CBP agents, including those employed with air and marine operations, the Legislature would not have used the term "Border Patrol" as a qualifier in the statutory text, and it would not have clarified that CBP "Officers" are peace officers as well. Although we are not bound by the agent's testimony in our interpretation of the statute, his assessment of CBP's structure nevertheless comports with the plain text of CPL 2.15 (7) and supports our conclusion that his position falls outside the language enacted by the Legislature (see also 8 CFR 287.5, 287.8 [setting forth regulations for all immigration officers and separately listing "Border patrol agents," "air and marine agents," and "CBP officers"]).

We acknowledge that, as originally written, CPL 2.15 broadly designated all "United States Customs Service special agents, inspectors and patrol officers" as among the "federal law enforcement officers" with peace officer powers. Then, in 2002, "[t]he Department of Homeland Security was created . . . to re-organize several federal agencies after the 9/11 attacks," including the US Customs Service as well as Immigration and Naturalization Service (Letter of Support, Bill Jacket, L 2014, ch 262 at 6; see Div of the Budget Bill Memorandum, Bill Jacket, L 2014, ch 262 at 8). To that end, in 2014 the Legislature made "technical" amendments to CPL 2.15 (3) and (7), relocating certain CBP agents to the provision governing Immigration and Customs Enforcement agents and officers, while modifying the original CBP provision to its current form, covering only CBP "Officers" and "Border Patrol agents" (L 2014, ch 262). Regardless of whether the

omission of air and marine operations from these amendments was intentional, concluding that the Legislature intended to include marine interdiction agents in the statute's current list of "federal law enforcement officers" would require us to read a specific job title not expressly present in the plain text into a statutory scheme that otherwise precisely delineates which of these federal employees are granted special authority under New York law. Inasmuch as "[w]e must read statutes as they are written," we decline to construe CPL 2.15 as including more positions than those the Legislature has listed therein (People v Kupprat, 6 NY2d 88, 90 [1959]; see People v Tychanski, 78 NY2d 909, 911 [1991]).

III.

Because the agent who stopped defendant in this case is not considered a federal law enforcement officer with peace officer powers pursuant to CPL 2.10 and 2.15, he could not have improperly circumvented the jurisdictional limitations on the powers reserved for those members of law enforcement under CPL 140.25, as the peace officers in Williams did. In other words, the agent's conduct here did not violate the Legislature's prescribed limits on a peace officer's arrest powers because he is not, in fact, a peace officer.

Defendant nevertheless notes, as the Appellate Division did, that a private citizen may neither "display . . . emergency lights from his or her private vehicle," nor "falsely express by words or actions that he or she is acting with approval of authority of a public agency or department with the intent to induce another to submit to such pretended official authority or to otherwise cause another to act in reliance upon that pretense" (166 AD3d at

1474, citing Vehicle and Traffic Law § 375 [41], Penal Law § 190.25 [3]).[4] But aside from the clear limits as to the justifiable use of physical force that may be applied during an arrest by a private citizen (CPL 35.30 [4]; CPL 140.35 [3]), as well as the requirement that "[s]uch person must inform the person whom he [or she] is arresting of the reason for such arrest unless he [or she] encounters physical resistance, flight or other factors rendering such procedure impractical" (CPL 140.35 [2]), nothing in the citizen's arrest statutes themselves set forth the methods that must be employed when, as here, a crime is committed in the responding citizen's presence (see CPL 140.30, 140.40; People v Foster, 10 NY2d 99, 102-103 [1961]).[5] We reiterate that whether this stop comported with constitutional principles or the express terms of the arrest statutes is simply not before us, as defendant failed to raise any such arguments before the suppression court.

---

[4] The dissent appears to be concerned that these statutes are insufficient to dissuade citizens who witness crimes from nevertheless "pretending to be . . . undercover police officer[s]" (dissenting op at 9). Whether these citizens are undeterred by what the dissent views as a "slight risk" (dissenting op at 8) of punishment for a class A misdemeanor is best reserved for the Legislature, which has the power to amend the arrest statutes and place additional constraints on a citizen's ability to effect an arrest. We, however, are mindful that "a court cannot amend a statute by inserting words that are not there, nor will a court read into a statute a provision which the Legislature did not see fit to enact" (Chemical Specialties Mfrs. Assn. v Jorling, 85 NY2d 382, 394 [1995] [internal quotation marks and citation omitted]).

[5] Despite these clear limitations on the circumstances in which a citizen may effect an arrest under CPL 140.30, the dissent reads our holding as an undue "expansion" of the statute and the powers prescribed therein, going so far as to link this case to other incidents involving the use of deadly physical force against unarmed citizens (dissenting op at 7-8). Of course, the circumstances of this encounter are markedly different from those cases, each of which occurred in other states carrying their own unique provisions.

The agent in this case is not a peace officer under the CPL because CPL 2.15 does not include marine interdiction agents. Thus, our decision in <u>Williams</u>—on which the courts below relied in granting defendant's suppression motion—is inapposite. Accordingly, the order of the Appellate Division should be reversed, defendant's motion to suppress denied, and the case remitted to Supreme Court for further proceedings in accordance with this opinion.

People v Limmia Page

No. 47

FAHEY, J. (dissenting):

I dissent.  This decision expands the ability of law enforcement officials to effect arrests that they have no authority to make, under the guise of a citizen's arrest.  By holding that a law enforcement official who is not a police officer or peace officer may impersonate

one in order to conduct an arrest, the majority undermines the rationale of our decision in People v Williams (4 NY3d 535 [2005]), that an arrest outside an official's authority cannot be justified by calling it a citizen's arrest. Here, the federal agent who stopped the motor vehicle in which defendant was a passenger acted in the manner of a police officer or peace officer when he activated emergency lights on his sports utility vehicle. For this reason, the agent was not carrying out a citizen's arrest under Williams and the fruits of the illegal traffic stop must be suppressed. I would affirm.

## I.

As the parties frame the issue, the sole question is whether the federal agent conducted a lawful citizen's arrest under the Criminal Procedure Law. The parties do not dispute that the agent's conduct may be considered an arrest, rather than merely a stop or other lesser detention, for the purposes of determining whether it is a valid citizen's arrest. The parties also do not dispute that the power of a citizen's arrest extends to a citizen who observes a lesser offense such as a traffic violation (see 1980 NY Op [Inf] Atty Gen 187, 1980 NY Op [Inf] Atty Gen 190, citing People v Nagell, 23 Misc 2d 452 [1960]; Note, The Law of Citizen's Arrest, 65 Colum L Rev 502, 503 & n 11 [1965]; Sutton v Evans, 4 AD2d 580, 581 [1st Dept 1957], appeal dismissed, 7 NY2d 741 [1959]). Moreover, although the authority to conduct a citizen's arrest does not authorize an investigative stop, the parties do not raise the issue whether a person may be arrested, following a traffic stop effected by a private citizen, for an offense other than the one that justified the stop.

## II.

I would adopt the Appellate Division's rationale and affirm, in accordance with the statutory scheme governing citizen's arrests, as interpreted by this Court. A brief survey of the historical background is necessary.

The right or privilege of a citizen to perform an arrest arose in medieval England, at a time when law enforcement entities were not yet organized or widespread and methods of pursuing fugitive offenders were scarce. Citizens had not only the right to arrest others who committed crimes but the affirmative duty to participate in apprehending a criminal "when the 'hue and cry' was raised" (Ira P. Robbins, Vilifying the Vigilante: A Narrowed Scope of Citizen's Arrest, 25 Cornell J L & Pub Pol'y 557 [2016], quoting Statute of Winchester 1285, 13 Edw 1 c 1-6 [1285], reprinted in George Burton Adams & H. Morse Stephens eds., Select Documents of English Constitutional History 77-78 [1901]). As the English common law developed in tandem with greater urbanization and the expansion of police forces, distinctions arose between arrests performed by a private citizen and those performed by a police or peace officer. A private citizen was permitted to arrest another for a crime committed in the citizen's presence but could "be held liable for false imprisonment if no crime was in fact committed" (Robbins, Vilifying the Vigilante at 564).

In the United States, some states recognized a common law right of citizen's arrest, Massachusetts doing so in 1850 (see Rohan v Sawin, 59 Mass 281 [1850]). Again, clear lines were drawn between the principles authorizing citizen's arrest and those governing arrests by police or peace officers. In Massachusetts, for example, the Supreme Judicial Court has held that a private person may not arrest a suspect for a misdemeanor because that "might . . . encourage vigilantism and anarchistic actions" (Commonwealth v Grise,

398 Mass 247, 251, 496 NE2d 162, 165 [1986] [internal quotation marks omitted]). Other states codified the principles. Under California's statutory scheme, for example, a citizen may arrest another for any "public offense committed or attempted in [the citizen's] presence" (Cal Pen Code § 837 [1]) or for a felony under broader circumstances (see id. [2], [3]).

In New York, the Criminal Procedure Law permits "any person [to] arrest another person (a) for a felony when the latter has in fact committed such felony, and (b) for any offense when the latter has in fact committed such offense in his presence" (CPL 140.30 [1]). In other words, a private citizen "may arrest for an offense only when the defendant has in fact committed it . . . and for an offense of less than felony grade only when the defendant has in fact committed the offense in his presence" (Commission Staff Notes, CPL 140.30). The statute, enacted in 1970, echoed the prior law (former Code Crim Proc § 183), enacted in 1881 (and revised in the 1960s), which provided that "[a] private person may arrest another, . . . [f]or an offense, committed or attempted in [that person's] presence" or "[w]hen the person arrested has committed a felony" (former Code Crim Proc § 183 [1967]).[1] A person who made a citizen's arrest for a felony that "had never been committed" or for a misdemeanor that had not been c

ommitted or had occurred outside the citizen's presence would be "guilty of a false imprisonment" (McLoughlin v New York Edison Co., 252 NY 202, 205 [1929]).

---

[1] The Commission Staff observed that "[t]he significance of this subdivision attaches not so much to rare arrests by ordinary private citizens as to arrests by police officers in localities where they are not authorized to act as such and, hence, are relegated to private citizen standards" (Commission Staff Notes, CPL 140.30).

The context of CPL 140.30 is key to its interpretation. Article 140 of the Criminal Procedure Law, which governs arrests without a warrant, includes several subdivisions governing warrantless arrests "by police officer" or "by peace officer" (see CPL 140.10–140.27); CPL 140.30 itself; and two subdivisions concerning warrantless arrests "by [a] person acting other than as a police officer or a peace officer" (CPL 140.35 [when and how made]; CPL 140.40 [procedure after arrest]).[2] CPL 140.30, 140.35, and 140.40 govern citizen's arrests.

In People v Williams, this Court interpreted this statutory scheme to mean "that the authority to make a citizen's arrest extends only to a 'person acting other than as a police officer or a peace officer' " (Williams, 4 NY3d at 538 [emphasis in original] [citations omitted]). We held that two peace officers, employed by a Housing Authority but acting outside their geographical area of employment when they stopped a motor vehicle and questioned the driver, could not justify their actions as a citizen's arrest. Because the two individuals were acting "as a police officer or a peace officer" (id., quoting CPL 140.35, 140.40) or, as we put it, "act[ing] under color of law and with all the accouterments of official authority" (id. at 539), they could not execute a citizen's arrest.

In the appeal before us, the dispositive question is therefore whether the federal agent was acting with the accouterments -- the outward characteristics -- of a police officer or peace officer within the meaning of Williams. Here, an on-duty federal agent, driving an SUV, pursued another driver on an interstate highway and on city streets, and then

---

[2] Other provisions, not pertinent here, follow CPL 140.40.

activated emergency lights to stop the other car. In these circumstances, a reasonable person would think that the individual in the SUV was a police officer or peace officer, not a citizen attempting to make an arrest. The record supports the lower courts' conclusion that the agent acted under color of law and with the outward characteristics of official authority. Indeed, it would strain credulity to reach any other conclusion.

The majority interprets Williams to mean that the restriction of citizen's arrests set out in that decision applies only to individuals who actually are peace officers: a convenient but inaccurate conclusion. In Williams, this Court relied on the language "acting other than as a police officer or a peace officer," which occurs in the titles of the pertinent statutes, CPL 140.35 (Arrest without a warrant; by person acting other than as a police officer or a peace officer; when and how made) and CPL 140.40 (Arrest without a warrant; by person acting other than as a police officer or a peace officer; procedure after arrest). Notably, the statutes are not headed "Arrest without a warrant; by person who is not a police officer or a peace officer." Moreover, the Williams Court deliberately selected two phrases – "color of law" and "all the accouterments of official authority" (Williams, 4 NY3d at 539) – that denote the outward appearance of authority.

The test, as the Williams Court understood it, is whether the individual conducting the stop or arrest conveys the appearance of "acting . . . as a police officer or a peace officer." Whether the individual is technically a peace officer under the Criminal Procedure Law is not to the point.[3] The purpose of the statutory scheme, as interpreted in

_____

[3] Given my analysis, I need not say whether I agree with the majority that the federal agent was not a peace officer under CPL 2.15 (7) (see majority op at 7-10).

<u>Williams</u>, is to deter vigilantism and ensure that those whom a society has chosen to protect citizens from crime may readily be identified as such.  In contrast, a person carrying out a citizen's arrest must do so without pretense of other authority.

The majority's reading of <u>Williams</u> results in the absurd state of affairs that a law enforcement official, acting outside the official's geographical area of employment, may <u>not</u> use emergency lights to effect a traffic stop, if the official <u>is</u> considered a peace officer, but <u>is</u> permitted to use emergency lights to effect a traffic stop if the official is <u>not</u> a peace officer.  There is no conceivable policy justification for such a mismatch.

### III.

Our recent national history is fraught with difficulties in race relations, amidst a cultural context in which there is a sharp division over the use of guns.  This would surely justify caution in this area, rather than an expansion.  Recent years have seen a spate of incidents in which self-proclaimed law enforcement officials, such as neighborhood watch group or homeowners' association members, and similar vigilantes have engaged in aggressive conduct, often with tragic consequences (<u>see e.g.</u> Lizette Alvarez & Cara Buckley, Zimmerman Is Acquitted in Trayvon Martin Killing, NY Times, July 13, 2013; Richard Fausset, 2 Suspects Charged With Murder in Ahmaud Arbery Shooting, NY Times, May 8, 2020; Mariel Padilla, Black Deliveryman Says He Was Blocked and Interrogated by White Driver, NY Times, May 18, 2020).  In some cases, citizen's arrest laws have been invoked as a possible bar to prosecution (<u>see e.g.</u> Frances Robles, The Citizen's Arrest Law Cited in Arbery's Killing Dates Back to the Civil War, NY Times,

May 13, 2020).  The expansion of citizen's arrest jurisprudence to amplify the authority of

law enforcement officials who are not police or peace officers is an egregious mistake.

The majority's analysis has another, equally if not more disturbing, natural

consequence.  According to it, any citizen who is not a police or peace officer, even one

who has no law enforcement training or qualification whatsoever, falls outside the

Williams restrictions.  Under this logic, a private citizen who has illegally installed

emergency lights in a private vehicle may roam the streets, pulling over drivers for

perceived traffic violations.  If successful in stopping a driver who is then arrested by the

police, the vigilante may possibly be prosecuted at the discretion of the authorities (the

same authorities who have exploited the stop), but the constitutional protections of the

Fourth Amendment would not apply.

The majority suggests that such vigilantism will be deterred because a private

citizen who activates flashing lights to command the stop of a vehicle violates the law (see

majority op at 11, citing Vehicle and Traffic Law § 375 [41]; Penal Law § 190.25 [3]).  The

majority believes that these "mechanisms" will "deter unbridled vigilantism" (id.).  Of

course, the federal agent in this case was not deterred, even though his conduct could in

principle have subjected him to personal criminal liability.  Generally, the slight risk of

incurring a criminal prosecution for impersonating an officer in order to effect an arrest

would not deter a private citizen who is able and inclined to apprehend someone by that

method.  Indeed, a citizen would likely be encouraged in effecting a citizen's arrest by the

thought that pretending to be an undercover police officer would facilitate subduing the

arrestee.

In short, it was proper for the <u>Williams</u> Court to emphasize the outward characteristics of official authority, rather than the technical definition of peace officers on which the majority now relies, and to provide a more powerful deterrent to vigilantism in the suppression of the fruits of such illegal conduct. In its attempt to justify a questionable stop, the majority has created a dangerous precedent.

IV.

I would reject the People's alternative contention that the physical evidence in this case should not be suppressed even if the stop was illegal.[4] Suppression is required when the government action violated a statute and "the principal purpose of [that] statute is to protect a constitutional right" (<u>People v Greene</u>, 9 NY3d 277, 280 [2007]; <u>see e.g.</u> <u>People v Taylor</u>, 73 NY2d 683, 690-691 [1989]; <u>People v Gallina</u>, 66 NY2d 52, 59 [1985]). Here, the statute in question is designed to protect a citizen's constitutional right to be free from unreasonable searches and seizures (<u>see</u> US Const 4th Amend; NY Const, art I, § 12) by precluding the justification of an otherwise unlawful detention as a citizen's arrest. The People maintain that the statutory scheme governing citizen's arrests does "not serve to protect individuals against government conduct," but rather is designed "to establish the circumstances under which a person may apprehend a person committing an offense." However, the intent to protect an individual's constitutional rights and the intent to set out

---

[4] Review of this question is not precluded by <u>People v LaFontaine</u> (92 NY2d 470 [1998]; <u>see also</u> <u>People v Concepcion</u>, 17 NY3d 192, 195 [2011]). Consideration of the People's alternative argument by Supreme Court was "a necessary component of [the] suppression ruling adverse to the [appellant]" (<u>People v Myers</u>, 303 AD2d 139, 140 [2d Dept 2003], <u>lv denied</u> 100 NY2d 585 [2003]).

the circumstances under which a person may detain another are not mutually exclusive. The People point to no reason why the legislature's concerns, in setting out who has the power to arrest, would not have included, as part of the legislature's principal purpose, the intent to ensure that arrests are conducted in a way that is consistent with the constitutional protection against unreasonable searches and seizures.

I would grant defendant's motion to suppress the gun seized by the police as a result of the agent's traffic stop. Accordingly, I dissent.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Order reversed, defendant's motion to suppress denied, and case remitted to Supreme Court, Erie County, for further proceedings in accordance with the opinion herein. Opinion by Judge Feinman. Chief Judge DiFiore and Judges Stein, Garcia and Wilson concur. Judge Fahey dissents and votes to affirm in an opinion in which Judge Rivera concurs.

Decided June 11, 2020